EASTERN DIST.
May, 1836.

CHARDON'S
HEIRS
vs.
BONGUE.

him in fraud of
her rights; but
when she claims
this right, in ad-
dition to a judg-
ment of separa-
tion from bed
and board, from
her husband, and
fails in the first,
she is not enti-
tled, *then*, to any
remedy in rela-
tion to the pro-
perty.

9L 459;
46 611
9 459
f120 735

## CHARDON'S HEIRS *vs.* BONGUE.

APPEAL FROM THE COURT OF PROBATES FOR THE PARISH AND CITY OF NEW-ORLEANS.

There is no rule of law requiring the names of the witnesses to a will, to be inserted in the caption, or any particular part of the testament. It is sufficient if they sign.

A mere suspension of the proceedings in making and writing a will by the notary, for two or three hours, in consequence of the weakness of the testator, or his want of decision, or for time to reflect more maturely on the disposition of his property and affairs, when the notary and witnesses do not leave the house, is not a turning aside to other matters, so as to render the will illegal or null.

The notary is prohibited from interrogating the testator, or so to shape his inquiries, while writing his will, as to suggest a particular disposition of his property. A suggestion of the notary, is proscribed as a ground of nullity, by the Louisiana Code.

This is an action instituted by the heirs and representatives of Joseph Chardon, deceased, residing in France, against the defendant as testamentary executor, to annul and set aside the will of the deceased.

The pleadings and evidence of this case, are so fully set forth in the opinion of the probate judge, that the following extracts are taken as a full statement of the case.

"Joseph Chardon, formerly of the city of New-Orleans, died in the said city on the 7th of July, 1830. A few days previous to his death, to wit: on the 3d of July he executed his testament before Felix De Armas, notary public; by that testament he emancipates all his slaves, bequeathes to one Jenny and to one Eugene, formerly his slaves, a sum of three thousand dollars each, and institutes the defendant, Pierre Isaac Bongue, his universal legatee, and appoints him his testamentary executor.

"The plaintiffs appearing as brothers and nephews, and as such lawful heirs of the said Joseph Chardon, attack the will made by the deceased, as aforesaid, on several grounds and allegations detailed in a petition and supplemental petition, by them presented to this court, and pray that the same be declared null and void, as well as the proceedings had thereupon, and that the said J. Chardon be adjudged to have died intestate, &c.

"The answer is a general denial.

"The best means, I think, of arriving at a decision of the case, is to examine *seriatim* the allegations of the plaintiffs, and to ascertain how far they are supported by the evidence, and by the laws applicable to the case.

"1. The first allegation of the plaintiffs is, that Felix De Armas, the notary public who received the testament, 'has never been requested by the said Chardon, to come near him for the purpose of receiving this pretended will, in which

CHARDON'S
HEIRS
vs.
BONGUE.

besides, no mention is made that he had been requested to do so.'

" The testimony shows, on the contrary, that the deceased was desirous that F. De Armas should make his will. Phœbe, a witness introduced by the plaintiffs, says: 'he expressed a wish to make his will; this was some two weeks previous to his death; he called deponent up at night, and requested her to go after Mr. De Armas, the notary, that he wanted to make his will; that his property should not go to his relations, they having wounded him in the Havana, of which wounds he was dying.' Felix De Armas states: ' that some days previous to the receiving of the instrument, some five or six days, he was sent for by the late Joseph Chardon; deponent accordingly repaired to his house, on Levee street; Mr. Chardon then observed to deponent, that he wished to have his business arranged; deponent was the notary of Mr. Chardon, and had frequent occasions of seeing him; deponent observed to him, that whenever he was ready, he had only to send for deponent to receive his will; Chardon at this time was sick; some days afterwards Mr. Bongue called on deponent,' &c.   The witness then goes on to state, that Bongue having informed him that Chardon desired to make his will, he went, &c.   Jenny states, ' that when Mr. De Armas arrived, (*the very day that Bongue had gone for him,*) he asked of Mr. Chardon what he desired of him, to which Mr. Chardon replied, that he wanted to make his will.'   It is therefore evident, that it was at the request of Chardon that the notary came to receive his will.   With regard to the want of mention in the will of such request, I know of no law requiring such mention.

" 2.  The second allegation or ground is, ' that in this pretended testamentary deed, nothing shows or even indicates, that the witnesses, whose names are seen at the end of this pretended will, had been present to what properly constitutes the will, that is to say, the dictation by the testator, and the perusal (the reading I presume) to the testator, in presence of the witnesses, and that the said witnesses had

been the same whose names and christian names are men-
tioned at the end of the said will, and that this mention of
the names of the said witnesses, made only at the end of
this pretended will, is no sufficient compliance with the
exigencies of the law.'

"This appears to be an objection to the form of the will,
and on examining it attentively, I infer from all its parts,
that the subscribing witnesses to the will, are evidently
the same whose presence is stated at the beginning, and
throughout the whole instrument, wherever the witnesses
are mentioned; besides, no part of the evidence shows the
fact to have been different.

"3. The third allegation or ground is, 'that this pretended
will has been made in the house of said Bongue, in the
middle of his servants, which circumstance alone makes it
suspicious.' This ground will be examined hereafter, in
connexion with the allegation of fraud and violence.

"4. The fourth ground is, 'that Oliver Drolet and Jacques
Imbert, who appear in the said will as witnesses, were at the
time it is pretended that the said will was made, employed
in the service of the said Bongue, in the gambling house
kept by the said Bongue; that Laurent Garnier, now in
France, who appears also as witness to the said will, was a
complaisant friend of the said Bongue, who was giving him
salary for feigning of really gaming in the gambling house,
kept then by said P. I. Bongue, for the purpose of attracting
true gamblers; that the said Laurent Garnier was the same,
who, without any mission to that effect, on the part of the
said Chardon, went for and brought the said Oliver Drolet
and Jacques Imbert, to serve as witnesses to the said will.'

"It results clearly from the evidence, that the three
witnesses to the will, to wit: Oliver Drolet, Jacques Imbert
and Laurent Garnier, occupied more or less disreputable
stations in the gambling concern of the defendant. In fact,
the testator, the universal legatee, the witnesses, all belonged
to the same class; but although it be not disputed that there
are but few employments less honorable than those of a
gambling house, still there is no law in this state, incapaci-

EASTERN DIST. tating persons of that description to appear as witnesses,
May, 1836. either to a will or any other act, or in a court of justice; nor
CHARDON'S is there any law in this state, declaring that a man in the
HEIRS employment of a legatee, cannot be a witness to the will.
vs.
BONGUE. Even in France, where the law in that respect, very different
from ours, prohibits the testimony of the servants of a party,
it has been decided, *that the servant of the legatee may be a
witness in a public will.* Recueil général des lois et arrêts, par
Sirey, vol. 13, part 2, page 65. Journal du Palais, vol. 36,
page 525.

"5. The fifth ground is, 'that Felix De Armas, notary
public, had no capacity to draw, in a valid manner, the said
will as he did, at the time, when, and at the place where he
did draw it.' Felix De Armas's quality of notary being
acknowledged, his capacity for drawing a will at any time,
and at any place within the district of country for which he
is commissioned, is beyond dispute; and I must confess,
that I could not well understand the argument of the
plaintiffs' counsel on this ground.

"6. The sixth ground is, 'that the will has not been
written at one time, without interruption, and without turning
aside to other acts.' The very same words used by our present
code, article 1571, *at one time, without interruption, and without
turning aside to other acts,* were made use of in the Civil
Code, under which the Supreme Court decided the case of
Seghers, attorney for absent heirs vs. Autheman, executor,
&c., 1 *Martin, N. S.* 82. In that decision, the words
'without interruption' are considered as adding nothing to
the force of the words 'without turning aside to other acts,'
both phrases meaning, that nothing else shall be done, until
the will is completed. That such must have been the under-
standing of the legislator, results evidently from the 1578th
article of our present code, where the words *without interrup-
tion, or turning aside to other acts,* in the English side, are
represented, on the French side, by the words *de suite et sans
divertir à d'autres actes.* The French commentators on the
article of the French Code, describing the formalities in the
superscription of mystic wills, which requires, like our article

1578, that 'tout ce que dessus sera fait de suite, et sans divertir à d'autres actes,' observe, 'par le mot actes on entend affaires, *negotia*. On peut donner au testateur malade un breuvage, le pauser, s'il est blessé; mais on nepouvrait pas enterrampre ces formalités pour passer un bail, une vente, une procuration, au même pour écrire une lettre.' *Pandectes Françaises, vol. 9, page* 36. Unity of action and time, is all that is required by the different expressions employed in our law, as well as in the French law. Does the evidence in the present case show, that that unity was observed in the making of the will in question? From the testimony it does not appear, that any other *act* or business *negotium* was done or intervened, until the will was completed; therefore there was unity of action. The length of time which elapsed while the testament was making, and the pauses which the testator made, are insisted upon by the plaintiffs' counsel, as constituting an interruption.

"The testimony varies with regard to that length of time. Imbert, their principal witness, contradicts himself in that respect: for in his first examination, he says 'the will was made between 5 and 6 o'clock in the evening,' which would give us, at farthest, a duration of an hour, and in his second examination, on being asked how long Mr. De Armas was employed in receiving the will, he answers, 'a long time, two or three hours at least.' The notary, Felix De Armas, positively declares, that the will was written without interruption, and he explains, that Chardon, whilst dictating his will, was suffering, and would pause some time between the different clauses, and on being asked whether he considers a pause or delay of fifteen minutes, half an hour, or an hour, as an interruption, he answers in the negative. But nothing shows that there was a division of time, or in other words, that any thing foreign to the will intervened, to disturb the unity of time and of action.

" 7. The seventh ground is, 'that this pretended will has never been dictated by the said Joseph Chardon to the said Felix De Armas.' The plaintiffs, in support of this ground, rely upon the evidence of Imbert, one of the witnesses to the

EASTERN DIST.
*May,* 1836.

CHARDON'S HEIRS
*vs.*
BONGUE.

EASTERN, DIST.
May, 1836.

CHARDON'S
HEIRS
vs.
BONGUE.

will.  That witness states, 'that when the will was received, J. Chardon answered *with difficulty*, yes or no, to the questions put to him; he did not dictate it,' and on being recalled by the defendant's counsel, and cross-examined, he repeats, that Chardon did not dictate his will, but answered yes or no to what was asked him; that after the preamble of the will had been written down by the notary, Chardon *said distinctly*, that he gave liberty to his slaves, also three thousand dollars to Eugene, who is now in court, and the like sum to the other child; he then paused for a considerable time, and remained silent.  The notary then being tired of waiting on him, seeing that he did not resume, asked him how he meant to dispose of his property, and whether he had not relations in France, to which he replied he had no relations in France.  The notary reiterated this question to him several times, whether he had relations in France, he always appeared in difficulty to answer, but he finally answered that he had no relations in France; that after he had remained for a long time without saying any thing, the notary would ask him again about his relations, and he finally answered he had no relations in France.  The notary then told him to decide upon something or another, and that if he recovered from his sickness, the will would be null and void; he asked him, that since he had no relations in France, if he had not some friend here or in France, to whom he wished to leave his property.  This was repeated to him several times by the notary, after a long reflection, and finding that Chardon did not answer, the notary mentioned Mr. Bongue to him.  Chardon, who was then sitting in his arm chair, turned round and looked at Bongue, who was behind him, and then told the notary to name him, Bongue, to have charge of his property; that he left the whole of his property to him.  Being asked whether he recollects the precise words, which Chardon made use of when he named Bongue to take his property, the witness answers, that 'after the notary had named Bongue to him, as before stated, Chardon, after looking round towards Bongue, said, yes, name Bongue; then the notary asked him

if he wished to name Bongue his universal legatee, and he answered distinctly, that he named Bongue his universal legatee.' The same witness, in answer to questions asked of him, stated that previous to his stating so in court, he had said twenty times, that Chardon merely answered, yes or no; and among the persons to whom he most probably made the declaration, he mentions, as the only ones he can designate, Drolet and Garnier, the two other witnesses to the will, now absent, and Mr. Raymond, now in town. Being asked how he came to sign the will, which says that it was dictated by him, Chardon, when he now says that it was not so dictated, he answers that he signed after others, and that he was not acquainted with that sort of business, having been then, for the first time, called to witness such an instrument.

EASTERN DIST.
May, 1836.

CHARDON'S
HEIRS
vs.
BONGUE.

"But in support of their seventh ground, the plaintiffs contended in argument, that the will was not written by the notary as it had been dictated to him, and their argument in that respect, is founded upon the declarations of the notary himself. The notary says in one part of his testimony, that the will 'was written, if not in the same words, in the same sense as Chardon dictated it.' In another part he says, 'Mr. Chardon dictated the dispositions, phrase by phrase, if not in the same words mentioned in the will, in words conveying the same sense and meaning.' The notary does by no means assert, that the words used by the testator, were not the same as those written in the will; he only says, that if they were not, they were words of the same sense and meaning. Now, suppose the words were not the same, provided the sense and meaning of the words, written by the notary, were the same as those of the words used by the testator, the will would not be null; all commentators agree on the principle, that it is the identity of thoughts, and not that of words, which the law requires in such cases. Duranton, Cours de Droit Français, vol. 9, p. 11, No. 77. Dalloz, Jurisprudence du 19me. Siècle, vol. 10, p. 349. Favard de Langlade, Répertoire de la Nouvelle Législation, vol. 5, verbo Testament, p. 549, No. 22. Toullier, Droit Civil, vol. 5, p. 388, No. 419.

EASTERN DIST.
*May*, 1836.

CHARDON'S
HEIRS'
*vs.*
BONGUE.

"8. The eighth ground upon which the will is attacked, is the following: 'That the said will was the result of fraud and violence, used against the said Joseph Chardon, then dying, and without protection, by the said Pierre Isaac Bongue, Felix De Armas and Laurent Garnier.'

"In support of this ground, the counsel of the plaintiffs, have in argument made a very lively picture of the moral restraint and violence practised upon the testator, to have the will made as it is. The fact that when Chardon made his will, he was in the house of Bongue, the executor, and several other circumstances, have been represented as conclusive of the fraud and violence. Chardon's attachment to his family has been endeavored to be shown by a letter, which he wrote to his brother on the 25th of July, 1818, and which has been introduced in evidence, but from the whole of the testimony, the court has been forced to come to the conclusion, that his sentiments in that respect had undergone a complete change. It appears that posterior to the date of that letter, he went to France, where he made but a short stay, that he took with him, or was followed by two of his nephews; that being in the Havana he was robbed by those nephews, who even attempted to take his life, and inflicted upon him wounds which kept him lingering until his death, and that since that time he was entirely estranged from his family, and determined not to leave his property to them. Jenny, a witness, goes still further; she states that 'Chardon often spoke to her of his will after it was made, and appeared well satisfied that it was made, and that he had left none of his property to his relations; he told deponent, the reason of his not leaving any thing to his relations was, that they had attempted to assassinate him at the Havana, speaking of his nephews; and would not leave any thing to his brothers, that the nephews should not profit through them.' He expressed this opinion six months before his death, and always, for six or eight years had been of the same mind, ever since the nephews attempted to assassinate him. Besides, it is in proof, that Chardon and Bongue had had much dealing and confiden-

tial business together, long before Chardon's death. That Chardon left his own house on the advice of his physician, and went of his own accord to the house of Bongue.

EASTERN DIST.
May, 1836.

CHARDON'S
HEIRS
vs.
BONGUE.

"Probably to support their allegation of fraud, the plaintiffs' petition states two circumstances, which, although I consider immaterial for the decision of this case, ought not to be passed over. The first is, 'that Bongue, after the death of Chardon, did not make an inventory of the succession, and that he hastened to collect and realise what he could of the said succession, and to leave the country, carrying away the most he could of the said estate.' Now in point of fact, the evidence shows that an inventory *was made*, (testimony of De Armas) that Bongue left this city more than one year after the death of Chardon, to go to France for the benefit of his health, and that he left considerable property here.

"Upon the whole, the court considering, 1st. That the will of Joseph Chardon, passed before Felix De Armas, notary public, of the city of New-Orleans, is in due form of law, that is to say, according to article 1571 of the Civil Code of Louisiana. 2d. That the enunciations in said will contained are true. 3d. That the said will has not been obtained by unfair or dishonest means.

"It is, ordered, adjudged and decreed, that judgment be entered in favor of the defendant, and that the plaintiffs pay the costs of this suit."

From this judgment the plaintiffs appealed.

*Fourchy, Magnin* and *Caillard,* for the appellants, made the following points.

1. The last will of the late Joseph Chardon is null and void, on account of the most material exigencies of law not being complied with.

2. It is null and void, the consent, on account of the fraud practised, not having been free.

3. The judgment of the court below must be reversed as contrary to law and evidence.

4. The last will of J. Chardon must be annulled, with judgment for the plaintiffs as his legal heirs.

EASTERN DIST.
May, 1836.

CHARDON'S
HEIRS
vs.
BONGUE.

*Roselius,* for the defendant, contended that the allegations of fraud in the execution of the testator's will, are unsupported by the evidence in the record.

2. On the other hand the testimony shows, that all the formalities required for the validity of the will, have not only been substantially, but strictly complied with; therefore, it should stand, and the judgment of the Court of Probates be affirmed.

*Bullard, J.,* delivered the opinion of the court.

This is an action brought by the heirs at law of Joseph Chardon, to annul a testament purporting to have been made by public act, on various grounds as set forth in their petition. The judgment in the court below being in favor of the defendant, as executor and universal legatee, the plaintiffs prosecute this appeal.

The ground of nullity alleged by the plaintiffs is, that it does not appear from the will itself that it was read over to the testator in presence of the same witnesses who were present at the dictation, but that other witnesses may have been present than those who signed the will. The caption of the will does not name the witnesses, nor are their names mentioned at all until towards the close of the act. The notary begins by saying that the testator appeared before him, and in presence of the witnesses hereinafter named and subscribed, and towards the close of the act the witnesses are named, as having been expressly called for the purpose. That part of the act which relates to the reading of the will, as well as its dictation, is in the following words: " C'est ainsi que le présent testament a été dicté par le testateur au notaire, qui l'a écrit tel qu'il lui a été dicté, et ce de suite, sans interruption et sans divertir à d'autres actes, le tout en présence des dits témoins ; et mêmes présences le notaire ayant lu ce testament au testateur à haute et intelligible voix, il a déclaré le bien entendre et comprendre, et y persévérer comme contenant ses dernières volontés."

The plain and obvious meaning of this is, that the same witnesses whose names are afterwards inserted, and who

signed the act with the notary, were present when the will was dictated, written by the notary, and read over to the testator. We are acquainted with no rule of law which requires that the names of the witnesses should be inserted in any particular part of the testament, and it appears to us sufficient, if it is shown by the act itself, that they were present as required by the code, and that they possessed the legal qualifications. We are not driven to any thing like implication, in order to arrive at this conclusion. It is stated in explicit terms, that the same witnesses named in the will, and who signed it, were present when the same was dictated, written and read over to the testator by the notary. 30 *Sirey*, 2, 156.

EASTERN DIST.
*May*, 1836.

CHARDON'S
HEIRS
*vs.*
BONGUE.

There is no rule of law, requiring the names of the witnesses to a will, to be inserted in the caption or any particular part of the testament. It is sufficient if they sign.

Independently of this objection to the form of the testament, the plaintiffs allege that it is null, because in point of fact: 1st. The formalities were not fulfilled as required by law at one time, without interruption, and without turning aside to other acts; 2d. That it was made by means of interrogations addressed to the testator by the notary, and his answers; 3d. That it was not dictated by Chardon, and written as dictated; 4th. That it is doubtful whether the testament was legally read over to the testator; 5th. That it is antedated; 6th. That the will of Chardon was not free; and, 7th. That the testament is the result of fraud, and of moral constraint.

The four last points may be dismissed from our consideration, with a single remark, that there is no evidence whatever inducing us to believe that the testament bears a false date; that it appears both by the will itself, and by the testimony of witnesses, that it was read over to the testator according to law, and that no constraint, no fraud, or no conspiracy to draw from the testator such a disposition of his property are proved; and that it is no longer permitted by our law to attack a testament, on the ground that its dispositions were the result of suggestion, hatred, anger or captation. *Article* 1470. (1479.)

We confine ourselves, therefore, to the inquiry, whether it has been shown that the testament was not dictated and

EASTERN DIST.
*May, 1836.*

CHARDON'S
HEIRS
*vs.*
DONGUE.

A mere suspension of the proceedings, in making and writing a will, by the notary, for two or three hours, in consequence of the weakness of the testator, or his want of decision, or for time to reflect more maturely on the disposition of his property and affairs, when the notary and witnesses do not leave the house, is not a turning aside to other matters, so as to render the will illegal or null.

The notary is prohibited from interrogating the testator, or so to shape his inquiries, while writing his will, as to suggest a particular disposition of his property. A suggestion of the notary is proscribed as a ground of nullity, by the Louisiana Code.

written as dictated, without interruption, and without turning aside to other acts in a legal sense of those expressions.

It is shown that after the first bequests were written, the testator became silent, and for a considerable time ceased to dictate, and the notary stopped writing. How long this cessation lasted is not clearly shown ; the notary says less than an hour and a half. But the witnesses and notary remained together in the room, and the delay was attributable, either to the feebleness or indecision of the testator ; in the meantime it is not pretended that any other business was transacted. This, it is contended, was an interruption which vitiates the testament. We cannot yield our assent to that proposition. A mere suspension of the proceeding, in consequence of the weakness of the testator, or his want of decision, or to give himself time to collect his thoughts, or to reflect maturely on the disposition of his property, does not amount, in our opinion, to an interruption in a legal sense of the word. In some cases it might be, on the contrary, evidence of greater deliberation on the part of the testator.

With respect to the principal point in the cause, to wit : whether the will was in fact dictated by the testator and written by the notary as dictated, we will premise what we have to say on that subject, by remarking that the objection on the ground that the testator was interrogated by the notary, resolves itself mainly to one of suggestion. The notary, by asking a question as to what disposition the testator wishes to make, might so shape his inquiry as to suggest a particular disposition, and might amount to an artful insinuation, spoken of by some of the French authorities cited in the argument. What is this but suggestion, which is now proscribed as a ground of nullity by our code ? It is shown that the notary did several times inquire whether the testator had not relatives and friends in France. If this was a suggestion to the testator, not to forget his distant relatives in his last moments, the plaintiffs, who are those persons, could not reasonably complain of it.

The evidence relating to the dictation and writing of the will, is certainly contradictory, and even irreconcilable. On

the one hand, Imbert, one of the subscribing witnesses, swears at first that the testament was not dictated by the testator, but that he barely answered yes or no to the questions put to him by the notary. On a subsequent examination, he qualifies this, by admitting that some of the dispositions of the will were dictated. On the other hand, the notary public, Mr. De Armas, testifies that the testament was written by him, according to the dictation of the testator, if not word for word, at least that he gave his sense and meaning.

In support of the will, we have the act itself, duly certified under the official sanction of the public officer, fortified by his oath and three subscribing witnesses, one of whom alone has been examined to contradict it. The other witnesses appear to be still alive, but their testimony has not been procured. Under those circumstances we concur with the Court of Probates, that the plaintiffs have not shown enough to authorise us to declare the testament null and void.

It is, therefore, ordered, adjudged and decreed, that the judgment of the Court of Probates be affirmed, with costs.