LAVINIA CHEVALIER et al. *v.* JULIA ANN WHATLEY AND HUSBAND, Consolidated Cases.

| 12 | 651 |
|----|-----|
| 46 | 391 |
| 12 | 651 |
| 120 | 739 |

Insanity, which of itself, is sufficient to strike an act with nullity, cannot be set up, unless the interdiction of the insane person had been pronounced or petitioned for previous to the death of such person, except in cases in which the mental alienation manifested itself within ten days previous to the decease, or when the want of reason results from the act itself which is contested.

But when the contract is sought to be set aside, the state of mind of the party at the time, may be proven, although the proof tends to show imbecility and there has been no interdiction.

Contracts made with weak-minded persons will be closely scrutinized, and a presumption of fraud will arise from circumstances, indicative of over influence or any advantage improperly taken, which would not arise in a strong-minded person.

APPEAL from the District Court of Catahoula, *Barry,* J.

*McGuire & Ray* and *Tailferro,* for defendants. *Smith & Spenser,* for plaintiffs.

SPOFFORD, J. The plaintiffs, in these consolidated cases, are the sisters and sole heirs at law of *William Simmons,* who died intestate in 1853.

The object of the suit is to annul two acts of sale executed by the said *Simmons,* one on the 26th February, 1848, conveying the slave *Nancy,* and one of her children, to the defendant, *Julia Ann Whatley,* and the other on December 28th, 1847, conveying the slave *Maria,* to the defendant, *Wooten Whatley. Julia Ann Whatley,* was the aunt, and her son, *Wooten,* the cousin of *William Simmons.* The expressed consideration of the former sale, was "the sum of five hundred dollars in stock in cattle and hogs, paid by the said *Julia Ann Whatley.*" The other sale purports to have been "in consideration of the sum of two hundred dollars, cash in hand, paid to the said *William Simmons,* by the said *Wooten Whatley.*"

The petition is not framed with technical precision and fullness. But it sufficiently appears that two distinct grounds are relied upon to set aside these sales: 1st, the idiocy or insanity of the vendor, *Simmons:* 2d, the fraud of the defendants, who are alleged to have practised upon the weak mind of *Simmons,* and contrived to procure these acts from him under the pretence of a purchase, when they really paid him no consideration whatever.

So far as the first ground is concerned, it is clear that the insanity which, *of itself,* is sufficient to strike an act with nullity, cannot be set up by *Simmons'* heirs, in this case. They did not provoke his interdiction, and it never was pronounced. "After the death of a person, the nullity of acts, done by him, cannot be contested for cause of insanity, unless his interdiction was pronounced, or petitioned for, previous to the death of such person, except in cases in which the mental alienation manifested itself within ten days previous to the decease, or in which the proof of the want of reason results from the act itself, which is contested." C. C. 396. See also Art. 1781.

But these rules apply to cases where the sole infirmity in the contract, necessary to be alleged, is the incapacity of the party to contract, *by reason of insanity.* When the contract is sought to be set aside upon another legal ground, to wit: for fraud, the state of mind of the defrauded party, at the time, may be proven, although the proof tends to show imbecility, and there has

been no interdiction.   Otherwise, frauds might be perpetrated upon weak-minded men with more prospect of impunity, in case of detection and exposure before the courts, than upon men of ordinary intellect.

Our law, upon the subject of interdiction, does not impair the force of the rule that contracts made with weak-minded men, will be closely scrutinised, and those who deal with them held to a strict standard of good faith.   "In respect to this class of cases," says Story, "the law will raise a presumption of fraud from circumstances, indicative of any over influence, or any advan- tage improperly taken, when, if the case were of a strong-minded person, no such presumption would arise."   Story on sales, sec. 182.   The inquiry into the character of *William Simmons'* mind, was, therefore, pertinent and allowable in examining the question of fraud.   See *Holland* v. *Miller*, decided at this term.

It is asserted by defendants' counsel, that no other fraud is charged than the bare fact of their having purchased of an idiot.   If this were so, the inquiry would stop there.   But we find a much more extensive and specific complaint of fraud than that; a complaint sufficient, we think, to have put the defendants on their guard, and, therefore, sufficient to justify the introduction of the evi- dence which was excepted to.   The plaintiffs, in the first case, declare the sale to have been "a disguised donation, *without consideration, gotten up and art- fully contrived by said Julia Ann and Archibald, acting on an idiot, their nephew, for the purpose of injuring and defrauding him.*"

Corresponding allegations are made in the other petition.

If these allegations are true, the deceased would have been entitled to relief against an imprudent bargain into which he had been decoyed, and his heirs are also.

It may be true, as said by the defendants' counsel, that *William Simmons*, is not shown to have been insane, or an idiot, in the true sense of those terms. But he is certainly correct in the opinion that *Simmons* was an excessively weak-minded person, most easily duped and deceived.   These sales of all his worldly estate must, therefore, be carefully scrutinized, and if he appears to have been defrauded out of his whole property by them, the parties who de- frauded him, must be decreed to make restitution.   The defendants were his relatives, and he was living with them.   Their influence, as relations and pro- tectors, over one of his small mental capacity, is obvious.   The act attacked in the first suit, purports to be a sale; but, even upon its face, it is evident that it could not have been a sale; the price fixed in money, was not to be paid in money; it was to be paid in cattle and hogs; there was to be an exchange of a negro woman, aged twenty, and her child, for five hundred dollars' worth of cattle and hogs; but how many cattle and hogs that would be, seems to have been left to the discretion of the stronger minded party.   The evidence leads us to the conclusion that the number was never fixed; that the deceased was amused with the belief that he was the owner of an indefinite portion of the stock belonging to the *Whatley* place; that he was encouraged to boast about his cattle and hogs, and thus lend an air of plausibility to the pretended sale; that he, on one occasion, sold a hog to the trader with whom the *Whatleys* dealt, and received something in return for it; but that when he undertook to trade upon a more extended scale in his supposed acquisitions, the *Whatleys* refused to ratify his contracts, because he had exceeded his powers.   In short, the *Whatley* stock continued as before, and as they always intended it should

continue, to belong to the *Whatleys*, and *William Simmons*, who seems to have worked faithfully enough for them to earn, at least, his living, died in their employ, and left nothing to put upon an inventory.

The two hundred dollars, the professed consideration of the other sale, it is proven, were never paid.

It seems from some testimony in the record, that shortly before his death, *Simmons* discovered and complained of the artifices by which he had been wheedled out of his property, and a conditional promise of restitution was made by his aunt. These suits were brought immediately after his death.

If the District Judge had not changed his mind on the question of the admissibility of the evidence of fraud, and told the jury to disregard it, we cannot doubt but they would have found a verdict for the plaintiffs in the other case, as they did in the suit against *Wooten Whatley*. We are satisfied with the proof of fraud in both cases.

It is, therefore, ordered and decreed, that the judgment in the case of *Lavinia Chevalier et al.*, against *Julia Ann Whatley* and *husband*, be avoided and reversed, and that the verdict of the jury be set aside. And it is now ordered, adjudged and decreed, that the act of sale described in the petition be vacated and annulled, and that the plaintiffs, as heirs of *William Simmons*, be recognised as the true and lawful owners of the slave, *Nancy*, and her child, and recover possession of the same from the defendants, *Julia Ann Whatley* and *husband*. It is further ordered, that the judgment of the District Court, in the case of *Lavinia Chevalier et al* v. *Wooten W. Whatley*, be affirmed. And it is further ordered, that the defendants, in these consolidated cases, pay costs in both cases.