(45 South. 565.)

No. 16,605.

DUCASSE'S HEIRS v. DUCASSE.

(Jan. 9, 1908. Rehearing Denied Feb. 3, 1908.)

1. WILLS—EXECUTION—WITNESSES—NUMBER.

An excess in the number of witnesses to a will does no harm.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, § 280.]

2. SAME — NUNCUPATIVE — STATUTORY PROVISIONS.

The express mention which must be made in a nuncupative will by public act of the will having been dictated by the testator and written by the notary as dictated in the presence of the witnesses, and of the residence of the witnesses, is not required to be made in any particular part of the will. If it is made in any part of the will, the law is complied with. The notarial act is an indivisible whole, and the signatures attest it as a whole.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, § 365.]

3. SAME.

Whether the names of the witnesses should not be mentioned in the body of the act—quære?

4. SAME.

The requirement of presentation in making a nuncupative will under private signature is complied with by a declaration on the part of the testator in the presence of the witnesses that the instrument contains his will.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, § 362.]

5. SAME.

Where, in the presentation form, the testator has heard the will read and has declared it to be his will, the fact that some of the clauses were inserted by the amanuensis of his own motion, without dictation by the testator, is insignificant.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, § 359.]

6. BASTARDS — ILLEGITIMACY—PERSONS ENTITLED TO CONTEST LEGITIMACY.

The legitimacy of the children of the wife born during marriage can be contested only by the husband or his heirs, and only in a direct suit brought for that purpose.

7. DIVORCE — PROHIBITION TO MARRY — ADULTERY.

Marriage between accomplices in adultery is prohibited only where there has been a divorce.

8. MARRIAGE — VALIDITY — INSANITY—AFTER DEATH.

The validity of a marriage cannot be contested on the ground of insanity after the death of the alleged insane person, unless his interdiction was at least petitioned for before his death, except when the insanity manifested itself within 10 days previous to his death; and in the latter case the suit must be brought within 30 days after his death.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Marriage, § 126.]

9. SAME — PERSONS ENTITLED TO DEMAND — HEIRS.

The right to demand the nullity of the marriage on the ground of absence of consent is strictly personal to the spouses. It does not pass to the heirs.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Marriage, § 125.]

10. WILLS — TESTAMENTARY CAPACITY — EVIDENCE—SUFFICIENCY—INSANITY.

On the facts, it is found that the testator, though afflicted with hemiplegia and resultant paralysis, was not insane.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, §§ 137–161.]

(Syllabus by the Court.)

Appeal from Eleventh Judicial District Court, Parish of Natchitoches; Charles Victor Porter, Judge.

Action by the heirs of J. M. Ducasse against Mrs. Victorine Ducasse, executrix. Judgment for defendant, and plaintiffs appeal. Affirmed.

Breazeale & Breazeale (Gabriel Fernandez, Jr., of counsel), for appellants. Jack, Fleming & Hicks and Scarborough & Carver, for appellee.

PROVOSTY, J. The following will is sought to be set aside by the heirs at law of the testator:

"State of Louisiana, Parish of Natchitoches.

"Before me, Henry M. Hyams, clerk of the Eleventh district court in and for the parish of Natchitoches, duly commissioned and qualified as such, ex officio notary public, and in the pres-

ence of five competent witnesses residing in the parish of Natchitoches, state of Louisiana, personally came and appeared Jean Marie Ducasse, known as Jules Ducasse, a resident of Natchitoches, state of Louisiana, who declared unto me, notary, in the presence of the aforesaid and undersigned witnesses, that he wished to make his last will and testament, and that he wished me to receive his last will and testament (and that he wished me to receive his last will and testament); and he, the said Jean Marie Ducasse, testator, dictated to me this his last will and testament in the presence of the undersigned witnesses, and I, notary, received same from his dictation and wrote down the same as it was dictated to me in presence of him, the said Jean Marie Ducasse, alias Jules Ducasse, testator, and the aforesaid witnesses, in words as follows, to wit:

"I, Jean Marie Ducasse, known as Jules Ducasse, being sound in mind and knowing that life is precarious, wishing to make a proper disposition of my property in case of my death, in the presence of the said notary and witnesses do make and declare this my last will and testament, revoking all former wills and testaments whatsoever.

"First. I desire that all my just debts be paid.

"Second. I give and bequeath unto my sister, Orasie Balsac, of France, the sum of one hundred dollars.

"Third. I give and bequeath unto my sister, Marie Lasalle, of France, the sum of one hundred dollars.

"Fourth. I give and bequeath unto my brother, Louis Ducasse, of Tolouse, France, the sum of one hundred dollars.

"Fifth. All the remainder of my property, whether real or personal, which I may leave at the date of my death, I give and bequeath unto my wife, Victorine Ducasse, of the city of Natchitoches, and make and appoint her the executrix of this my last will and testament, and give her seisin of my estate from the moment of my death, and dispense her from giving bond.

"This last will and testament of Jean Marie Ducasse, alias Jules Ducasse, was dictated by him to me, notary, in the presence and hearing of the five undersigned competent witnesses, and the same was reduced to writing by me, notary, as dictated by said testator.

"I, notary, then read the above will to the said testator in the presence of the aforesaid witnesses, and the said testator declared to me, notary, and the aforesaid witnesses, that he was entirely satisfied therewith, and he, the said Jean Marie Ducasse, alias Jules Ducasse, testator, signed the same, in my presence and in the presence of the aforesaid undersigned witnesses, and the whole was received, dictated, read, and signed at one time, without interruption, and without turning aside to any other act. He declared that he was paralyzed and could not write.

"This done, read, and signed at the residence of the said testator, in the town and parish of Natchitoches, state of Louisiana, on this the 21st day of Feb., A. D. 1905.

his<br>
"Jean Marie X Ducasse,<br>
mark

declaring he was paralyzed and unable to write.

"Attest: C. M. Cunningham, Ben Wolfson, J. H. Hicks, V. G. Hyams, W. H. Jack.

"[Seal.]      H. M. Hyams, Clerk and Notary."

This will is alleged to be defective in form, in that:

(1) The witnesses are not named in the act.

(2) The testator did not sign, although able.

(3) It being stated that the witnesses were residents, there should have been only three, and not five.

(4) There being five witnesses, and they not being named in the body of the act, it is uncertain whether any particular three of them were present all the time.

(5) The witnesses are referred to as "aforesaid," although none are named in the body of the act, and, as a consequence, none could be "aforesaid."

(6) No declaration is made that the testator cannot write and sign, and that he has made his mark.

(7) Nor that the will was written by the notary.

(8) No express mention is made that the will was dictated by the testator, and was written by the notary as dictated, and was read to the testator in the presence of the witnesses, and that the witnesses were residents of the place where the will was executed.

Of these grounds—

No. 2 is not now insisted upon, in view of the incontestible proof that the testator was unable to sign his name.

Nos. 3 and 4 have no merit, because an excess in the number of witnesses does no harm. Dalloz, Nouveau Code Annoté, art. 971, §§ 100, 102, 103, 104.

No. 5 stands or falls with No. 1.

Nos. 6, 7, and 8 are shown by a mere reading of the will to be unfounded, since the

particulars in question are as a matter of fact mentioned in the will. All that the law required was that they should be mentioned in some part of the will; not that they should be mentioned in any particular part. Hence their mention in any part of the will was sufficient. The act is an indivisible whole, and the signatures attest it as a whole. Chardon's Heirs v. Bongue, 9 La. 458; Rongger v. Kissinger, 26 La. Ann. 338; Dalloz, Nouveau Code Annoté, art. 972, §§ 221, 222, 504, 505, 507.

No. 1 is more serious. We are not satisfied that the witnesses do not have to be named in the body of the act. In Chardon's Heirs v. Bongue, supra, the court seems to have taken for granted that the witnesses had to be named in the body of the act. The jurisprudence of France so requires. Laurent, vol. 13, No. 255; Dalloz, Juris. Gen. Vo. Dis. entre Vifs et Test. p. 206, § 754. But that jurisprudence would seem to be founded, not so much on the Code Napoleon as on section 12 of the act of 25th Ventose Ann. 11. That view, however, would seem to be the one most accordant with the requirement that express mention must be made of the witnesses and their residence; for it is the notary who must make this mention, and although, when he refers to the witnesses in the body of the act as "the undersigned witnesses," and signs the act after the witnesses have signed, he after a fashion designates them, yet after all it is the witnesses who, in such a case, name themselves by signing the act, and that manner of proceeding is, to say the least, exceedingly slipshod. We prefer to leave this knotty point to be solved in some other case which shall depend upon its decision. In the present case we find the will perfectly valid in point of form as a nuncupative will under private signature, and will content ourselves with sustaining it in that form.

The circumstances under which it was executed were as follows: Not being satisfied with a nuncupative will under private signature which had been executed a few days previously, Ducasse requested a lawyer, Mr. W. H. Jack, to attend to the execution of another. Mr. Jack took with him Messrs. C. M. Cunningham, lawyer and newspaper editor, J. H. Hicks, lawyer, V. G. Hyams, cashier of bank; Ben Wolfson, hotel proprietor, and H. M. Hyams, clerk of court and ex officio notary, and went to the house of Ducasse.

Mr. Jack testifies that, he being seated on the right and Ducasse on the left of the notary, and the four other witnesses being present, the notary wrote the will under the dictation of Ducasse, with no change except in phraseology, and then read it in a loud and audible voice; that Ducasse got the notary to read over again some of the paragraphs, and that after the reading Ducasse said, "That is my will and testament," and that they all then signed the will, Ducasse declaring that he could not write on account of paralysis and simply touching the pen after a cross had been made to stand as his signature; that the notary then held up the will and asked Ducasse whether it was his last will and testament, and Ducasse answered that it was; that all this was done at one time, without turning aside to other acts, and in the presence of all the persons above named. Cunningham, Hyams, Hicks, and Wolfson corroborate this testimony in all essential particulars.

That a will so executed is perfectly valid in nuncupative form by private act, see Succession of Reems, 115 La. 105, 38 South. 930.

Question is raised as to whether the witness Wolfson was a resident of the parish; but, granting that he was not, the notary can take his place as a witness and made the fifth witness required by law. Succession of Reems, supra; also other cases unnecessary to be looked up.

The statement of Mr. Wolfson that Mr. Jack dictated the will is, later on, qualified by the witness, and, if taken literally, would be in conflict with the testimony of all the other witnesses.

The statement of Mr. Hicks that he did not hear Ducasse dictate the clause revoking all former wills, even if taken as proof that said clause was not dictated by Ducasse, would not have the effect of vitiating the will in the presentation form. See Succession of Reems, supra. And the same thing may be said touching the admission of the notary that the words, "He declared that he was paralyzed and could not write," were inserted by him after the will had been read the first time; the testator not having expressed his said inability to sign until the time had come for him to sign.

We hold, therefore, that the will is valid in point of form, and pass to the other grounds upon which the plaintiffs contest its validity. They are:

(1) That the testator was insane at the time of making it, and incapable of making a will.

(2) That it is in favor of a concubine, since the marriage of Ducasse with Mrs. Godard, the universal legatee, a few hours before the execution of the will, was an absolute nullity, because the parties had been accomplices in adultery, and therefore were prohibited from marrying, and because Ducasse was at the time insane and incapable of consenting, and since, if the marriage was not an absolute nullity, it has to be annulled for the reason that Ducasse's consent was not free.

(3) That the universal legatee is a mere person interposed; the real beneficiaries being her two daughters, issue of an illicit intercourse between her and Ducasse during her marriage to Godard.

We shall consider these grounds in their inverse order.

No. 3. The legitimacy of the children of

120 LA.—24

the wife born during the marriage can be questioned only by the husband or his heirs, and only in a direct suit brought for that purpose. Succession of Saloy, 44 La. Ann. 433, 10 South. 872. Godard did not bring such a suit, and the delay has expired within which his heirs could have done so. Hence the legitimacy of the said two daughters cannot be questioned, and as a consequence there can be no question of interposition in connection with them.

No. 2. If defendant's marriage with the testator was valid, it removed entirely the disqualification which had resulted from the concubinage. Civ. Code, arts. 1481, 1746; Succession of Marc, 29 La. Ann. 412. The question under this No. 2 resolves itself, therefore, into that of the validity of the marriage. Was the marriage valid?

First, as to the nullity said to have resulted from the prohibition to the parties to marry as having been accomplices in adultery: In the first place, the record does not show that the illicit relations dated back to the time of defendant's marriage to Godard; and in the second place, such proof, if made, would have been immaterial, since the prohibition in question applies only where there has been a divorce, and there was none in this case. Civ. Code, art. 161.

Next, as to the absence of consent and absence of freedom of consent: The absence of consent is said to have resulted from Ducasse's insanity and consequent inability to consent, and the absence of freedom of consent is said to have resulted from the moral coercion which the defendant exercised over him—she a masterful woman, strong in intellect and will power, while he a paralytic, physically and mentally decrepit to the point of childishness and idiocy, and helpless. Short shrift can be made of these two grounds. Article 403, Civ. Code, provides:

"After the death of a person, the validity of acts done by him cannot be contested because of insanity, unless his interdiction was pro-

nounced or petitioned for previous to the death of such person, except in cases in which the mental alienation manifested itself within ten days previous to the decease, or in which the proof of the want of reason results from the act itself is contested."

See, also, article 1788, by which, except in the case of gratuitous acts, the action in nullity on the ground of insanity is limited to 30 days. See, also, the following cases where these legal provisions have been enforced: Aubert v. Aubert, 6 La. Ann. 104; Davis v. Greve, 32 La. Ann. 420; Succession of Smith, 12 La. Ann. 24; Chevalier v. Whatley, 12 La. Ann. 651. The idea of the law, says Marcadé, art. 507, is to punish the heirs for not having caused the insane person to be interdicted. Testaments, said this court in the Aubert Case, supra, may, after thirty days, be attacked for insanity, but "never contracts." "This difference," adds the court, "has its source in the consideration that laws regulating the capacity to contract are in furtherance of the natural rights of man, and that all restraints upon that capacity are abridgments of his liberty."

Since marriage is not a gratuitous act, but a civil contract, and since Ducasse lived more than 30 days after his marriage, and since his insanity, if it ever manifested itself at all, did so more than 10 days before his death, it is plain that the contesting of the validity of his marriage on the ground of insanity is precluded by the foregoing articles; and still less, if such a thing were possible, can the marriage be impugned on the ground of absence of freedom of consent. The right to sue on this ground is strictly personal. It does not pass to the heirs. Civ. Code, art. 110. "La nullité est rigoureusement personnelle, et l'action ne passe pas aux héritiers." Marcadé, art. 180.

Defendant duly pleaded all these defenses, and they were properly sustained.

Remains the ground of insanity: The testator came from France in 1855, and settled in the parish of Natchitoches. As we gather,

he conducted for a time a mercantile business, and later became a local capitalist and money lender. He died in 1906, leaving a fortune of some $70,000. His nearest relatives were a brother and two sisters, who remained in France. Many years ago he had a falling out with them about money matters. He thought they had dealt unfairly by him. This breach does not seem to have ever healed, except as to one of the sisters; but even towards her his brotherly affection does not seem to have ever revived. On a voyage to France in 1900 he visited this sister, but not his brother and other sisters, though he visited the cities where they lived. He remained a bachelor until his marriage to the universal legatee, Widow Godard, a half hour or so before making the will. He had been living in concubinage with her for many years, and in the same house with her for over ten years. He lived one year, one month and a few days after the marriage. Two or three years before he had become more or less paralyzed. At first he could go about, though with great difficulty, but gradually was confined to his house, and finally to his bed. At the time of his marriage he was still able to go out of the house, but no longer on the street. No physician who had made a special examination of him for the purpose of diagnosis was heard as a witness; but all agree that his trouble came from hemiplegia, or apoplexy on one side of the brain, which affects the organ of motion on that side of the brain, and, in consequence, the muscular movements on the same side of the body, leaving the like organ on the other side of the brain, and the muscular movements of the other side of the body, and also, but not always, the mental faculties, unaffected. The will involved in this case is a second will. Two or three days before making it, Ducasse had made another. The latter will was not produced, nor its contents proved. Plaintiffs allege that it gave one-third of the estate to Mrs. Godard, then the

testator's concubine, and one-third to each one of her daughters. Whatever this will was, Ducasse was not satisfied with it, and consulted counsel, and made the one involved in this suit. It was dictated by him to the notary, and was written down as dictated, saving only some changes in the phraseology. It contains nothing sounding to folly. So far as disinheriting his relatives is concerned, it was but natural that, separated as he had been from them for a lifetime, and having no special affection for them, he should have preferred to them the person who for so many years had been, in all except the marriage ceremony, his wife, and upon whose care he knew he was likely to become every day more and more dependent. The evidence leaves no doubt that Ducasse, while making this will, knew perfectly well what he was doing. The witnesses to the will, all business men, say that they saw nothing to lead them to suspect the contrary. Those of the witnesses who were asked whether, before the filing of this suit, they had heard of his being suspected of insanity, answered in the negative; and they were his closest friends and business associates, whom the least rumor of that kind would have been sure to reach. These witnesses, nine in number, and a number of others who conversed and transacted business with him immediately before and several months after the making of the will, say that while he was feeble and helpless, and his mental powers may have lost some of their pristine vigor, yet that by no act or word did he ever show any signs of insanity.

Of plaintiff's twelve witnesses, three never saw anything to lead them to suspect that Ducasse was insane. One, a physician, but who had made no special study of mental diseases, said that hemiplegia enfeebles the mind, to the extent sometimes of producing insanity, and even imbecility, and that it is progressive, and that its progress was mark-

ed in Ducasse. Others go no further than to say that Ducasse appeared to them feeble, simple, and childish; while some others say that his mind was gone entirely—that he was a mere imbecile. Those witnesses who testify so positively to Ducasse's having been insane, may have founded themselves, for all that appears, on absolutely nothing except the change brought to his physical appearance by paralysis. When challenged to cite any words or acts denoting insanity, they are singularly at a loss. They refer to circumstances which are either wholly insignificant, or which are contradicted by other witnesses. For instance, some mention hesitancy and difficulty of speech and lapses of memory, as if such things were not perfectly consistent with mental sanity. One adduces the fact that Ducasse "sat one day on a little stool in his garden digging up cocoa," and the fact that he went with the rest of the public to view the body of Bishop Durieve when laid out in state for that purpose. As proof of Ducasse's inability to hold his mind to one subject for any length of time, one of these witnesses brings forward that in a conversation on cabbage he mentioned cauliflower. One says that once Ducasse gave wrong instructions for the drawing up of an act of lease, so that the act had to be redrafted. Slight evidence as this would have been, it is contradicted by the person in whose favor the lease was made, who says that the act did not have to be redrafted, but only a space had to be filled which had been left blank for the insertion of the amount of the rent. The witness who thought that digging grass in one's garden, or viewing the remains of a deceased dignitary, is conclusive proof of insanity, entered into an important contract with Ducasse four months after the making of the will. He considered that on that occasion Ducasse was an imbecile. "One moment he knew me; the next moment he wanted to know who I was." The notary who passed the contract says that Ducasse

attended to the transaction himself; told Mrs. Ducasse to get the notes out of the safe; "asked me to figure the interest. He seemed to understand the business; says he did, and his actions indicated that he did." The statements of some of these witnesses that Ducasse could not keep his mind on any subject long enough to have a conversation, and that he was an imbecile or idiot, are simply overwhelmingly contradicted. Down to a few weeks of his death, friends continued to visit him, and he to converse with them, although he spoke with great difficulty; and he continued to attend to his business himself, his wife aiding him in the mechanical side of it. One of the witnesses who is most positive of insanity rented a store from him six weeks or two months before his death, and admits that he knew then what he was doing.

Judgment affirmed.

LAND, J., takes no part, not having heard the argument.