Zerega et al. vs. Percival.

## No. 11,280.

### ALICE A. ZEREGA ET AL. VS. JOHN PERCIVAL.

1. The law not having designated the particular place in which the date must be put in an olographic will, it may be placed at the head, at the foot, or in the body of the instrument.

2. A demand in nullity of a testament, on the ground of captation and suggestion, is barred by the provisions of Art. 1492 of the Revised Civil Code.

3. An action in nullity of a testament, on the ground that it was obtained by means of the ascendancy acquired by the legatee over the testatrix, in his character as a minister of religious worship, while in attendance upon her during the illness of which she died, is barred by the provisions of Arts. 1489 and 1492 of the Revised Civil Code. Further averment is necessary if the legatee is the husband of the testatrix, that he married her in fraud of the law, or with the fraudulent design of defeating the incapacity established by law.

APPEAL from the Civil District Court, Parish of Orleans.
    *Theard, J*

*Farrar, Jonas & Kruttschitt, J. C. Gilmore* and *Marshal Gasquet* Attorneys for the Plaintiffs and Appellants:

The question is *res nova* in this State and this court is at liberty to settle it on principle.

There is a profound and logical reason for excepting blood relations, and not husbands, from the provisions of Art. 1489, C. C.

The policy of the civil law is that property shall follow blood and not affinity.

The husband is not the heir of the wife nor the wife of the husband, except by irregular succession. The wife excludes only the State. The remotest blood relation, even a natural child acknowledged, excludes the husband from the wife's estate.

Therefore, in testamentary matters, are they put on the footing of mere strangers to each other.

Art. 909, C. N., is the substantial foundation for Art. 1489, C. C., but the latter departs from the former in several respects.

The article of the C. C. is limited to physicians and surgeons. The French article includes '' health officers and pharmacists.'' The one makes exception of all persons connected by blood. The other excepts blood relations within the fourth degree, and then only where the testator had no heirs in the direct line, unless the legatee was himself one of such heirs. It thus appears that the compilers of the Code of Louisiana have not merely copied the French article, but have profoundly modified it.

It has been held that where the marriage takes place during the illness of which the wife dies, and she is at that time the patient of the doctor who marries her, he is incapable of being her universal legatee. Gile de Han vs. Regel, Cour Royale de Paris, 25 Fevrier, 1817, J. du P., Vol. 14, p. 92. It is contended the allegations of the plaintiffs bring them exactly within the doctrine of this case; if not specific enough to establish a general case of fraudulent captation, they are sufficiently broad to enable plaintiffs to prove that the testamentary disposition in favor of the defendant was the outcome of his ministerial influence, and not of conjugal affection.

Art. 1489 of our Civil Code is to be strictly construed. The doctor or minister of religious worship who marries the sick person whom he has attended during her last illness is precluded from receiving from the decedent donations *inter vivos* or *mortis causa*.

Art. 1489 establishes a special incapacity.

Art. 1492 prohibits proof of the dispositions being made through hatred, anger, pure and simple unadulterated suggestion and captation, but it does not prohibit proof of fraudulent suggestion and captation.

Zerega et al. vs. Percival.

The intention of a testatrix to make a universal disposition will not be deemed absolute where the will, on its face, exposes a lack of exercise of voluntary testamentary intention, and contains no date as a last will and testament.

The date in the context of the testament will not be deemed to refer to the will, but to the universal disposition, and can not be deemed as the placing of the date of the will within the meaning of a date as one of the forms required by law for an olographic testamen·.

The writing, date and signature are intrinsic elements (of form) of an olographic will, as are also the voluntary intention and the capacity of the parties, testatrix and instituted heir and universal legatee.

In a suit to annul a will for fraud and lack of voluntary intention of the testator, date and incapacity of the universal legatee, arising under Art. 1489 (1476) Revised Civil Code, Art. 1492 (1488), prescribing that proof shall not be admitted of the disposition having been made through hatred, anger, suggestion and captation, will not apply as an exception to evidence or cause of action.

Article 1489 (1476), establishing an incapacity against clergymen, in certain cases, applies to the relation of husband and wife, in reference to nullity of a universal disposition by the wife to a clergyman, the husband, who has attended his wife in the exercise of his calling in illness of which she died.

Estoppel will not lie against a party contesting a will as legal heir, who has brought a suit to recover her own interest in furnitnre and movable property held by the executor, universal legatee, in possession under the will, when she afterward sues for the absolute nullity of the will.

In a case where the will contains no other disposition but the universal legacy to the husband and the appointment of the husband as executor, and the husband has been placed in possession under a judgment recognizing him as universal legatee and instituted heir, the testament will be set aside in entirety, as indistinguishable from a single illegal disposition *mortis causa*, in contravention of Art. 1489 (1476), R. C. C. Citing Coin d'Lisle, pp. 319-320, Chap. V, preceding Art. 967; Art. 970, pp. 333-345, No. 30, 348, 318-320, 439; note, pp. 9, 10, 84, 85, 88,

89; Demolombe, Vol. 21, p. 54; Don. and Test. 4, pp. 437, 438, 132-133, No. 156-162, pp. 169-170; Laurent, Vol. 13, Don. and Test., pp. 170, 190, 199, 200, 218, 224, 229, 333, 335; Demolombe, pp. 503-549, 344, 345; Laurent, Vol. 2, 464, No. 339, 484-564; Laurent, Vol. 11, No. 353; Coin d'Lisle, pp. 320-321; Coin d'Lisle, p. 320, pronounces the date "intrinsic;" Laurent, Don. and Test., Vol. 13, pp. 183-184; Coin d'Lisle, Don. and Test., p. 86; Hebert vs. Winn, 24 An. 385; Baudry Lacantierie, Vol. 2, 393; Pandectes Francaises, Don. et Test. 1717; see also Hebert vs. Winn, 24 An. p. 385, in our favor on this point of proof, and citation of Jarman on Wills—invoked by counsel for defendant; Troplong, Don. and Test., Vol. 2, p. 72, Sec. 491; Burke case, 35 An. pp. 163-179; Winn case, 24 An. p. 385; Ed. 1865, Micheaux Des Testaments, pp. 29, 30, 45, 46, 82, 92, Sec. 670, pp. 425, 276; Delvincourt, Vol. 37, 41-42; Troplong, Vol. 2, Don. and Test., 68, 75; Laurent, pp. 171, 228-242, 224, 191-201 (Vol. 13, Don. and Test.) ; Demolombe, Vol. 21; Zachariæ, Vol. 5, p. 29; Pothier, Don. and Test., Vol. 10, p. 533; Demolombe, 1, p. 347; Troplong, Vol. 1, Sec. 2, 488, p. 238; pp. 69-72, Sec. 488, 495; Poujol, Don. and Test., Vol. 2, p. 16, No. 4; Boileau, p. 489, Art. 909, C. N.; Ker on Fraud and Mistake, pp 193-195 and citations; Schouler on Wills.

In Dalloz we find innumerable opinions. Here are the following for refere ce:

On the question of fraudulent suggestion and captation: Dalloz, Vol. 5, Verb. Don. Dis., pp. 240, 288, 294, 291.

Two last decisions on the Article 909, C. N.—a fraudulent manœuvre. On fraudulent suggestion and captation: Dalloz, 1826, 1st part, p. 391; Dalloz, 1830, 1st part, p. 84; Dalloz, 1837, 1st part, p. 193; Dalloz, 1842, 1st part, p. 428; Dalloz, 1833, 2d part, p. 36; Zachariæ, D. C., Vol. 5, pp. 28 and 29: Boileau, Vol. 3, pp. 469, 495, note; Guillion Traite de Donations, Vol. 1, p. 136; Delvincourt C. C., Vol. 4, pp. 37-42.

The legacy made by a wife to her husband, who was at the same time her doctor, was declared null and void—for the reason that he had treated and cared for her professionally before her marriage and during the sickness of which she was ailing, at the time of her marriage, and of which she afterward died.

38

Delvincourt is already of the opinion that the incapacity existing before the marriage, to receive testamentary dispositions, can not be avoided by a subsequent marriage.

The Court of Cassation so decided that the incapacity existing at the time of the marriage could not be covered by the marriage. Delvincourt O. O., Vol. 4, p. 42.

The Court Royale, of Paris, decided conclusively and in terminis the same way in regard to same doctrine, by judgment and decrees of the 24th February, 1817. Sirey, 1818 (2d part, p. 354), also January 26, 1818 (2d part, p. 360).

These different prohibitions have been pleaded in the code in order to circumvent and prevent frauds which might be perpetrated on weak persons. Troplong, p. 69.

Cassat, 21st December, 1841, Devill, 43, 1, 51. Those are the same as the principles of the Louisiana Code. Proof of. simple captation is not admitted, but when fraud is connected, or a party to it, annuls a testament. Art. 1492.

Proof of hatred, suggestion and captation.

Correct, but where fraud is connected with suggestion and captation, proof of the same must be admitted. Micheaux de Testaments, p. 29.

*Carleton Hunt* Attorney for Defendant and Appellee:

When an olographic last will and testament is entirely written, dated and signed by the hand of the testatrix, it is a complete and perfect instrument The olograph is subject to no other form. The insertion by the testatrix, before signing, of the words " the whole written, dated and signed by me personally," affects in no way the validity of such a testament. 5 An. 278; 27 An. 269; Coin de l'Isle, Don. and Test., Art. 970, No. 30, Vol. 1, p. 343; Zachariæ, Droit Civil Francais, Note 22, Sec. 668, p. 490, Vol. 5; 1571, 1588; Demolombe, Donations et Testaments, Vol. 1, No. 56; Rogron, Art. 970, Codes Annotés, Marcade, Ed. 52, Vol. 4, pp. 6, 7, 8, 9; Duranton, Vol. 9, pp. 30, 31, Nos. 31, 32; Ed. 34, Zachariæ, Vol. 5, Sec. 688, p. 488 *et seq.* Dalloz, Codes Annotés, p. 783, Nos. 146, 166, 151; 3 Toullier, No. 369, p. 103; Brussels Ed. of 1837.

The charge of suggestion and captation is tantamount to what is un-derstood elsewhere by undue influence. Fraud and undue in-fluence are nearly synonymous. By the terms of Art. 1492 proof is not admitted of testamentary dispositions having been made through hatred, anger, suggestion or captation. 9 La. 458; 35 An. 161; 1 Redfield on Wills, Star., pp. 512, 514; Bouvier Law Dict., verbis captation and suggestion; Coin de l'Isle, Art. 901, Code Civil, Vol. 15, No. 16, p. 852; Demolombe, Don. and Test., Vol. 1, pp. 410, 411, No. 384; Bédarride des Dol et de la Fraude, Vol. 1, pp. 392, 393, 389.

Art. 1492, C. C., is copied from Art. 18, p. 212 of the Code of 1808, known as the Digest of the Civil Law. Art. 18 was proposed in the shape of an article in the projet for the Civil Code of France, but was rejected. The framers of the Code of 1808 had before them the discussion on the projet. The public policy which was rejected in France prevailed in Louisiana. The law as formulated in Art. 18, Code 1808, and Art. 1492, R. C. C., has always remained in force in th s State. Locré, Legislation Civile, Vol. 1, Chap. 6, pp. 71, 72, 73.

When a case, being an action in nullity of an olographic testament, on account of captation and suggestion and undue influence, comes on for trial; and the defendant immediately raises the objection that under Art. 1492, R. C. C., proof is inadmissible, and that the petition is vague, and wanting in all proper specifi-cations and particularization of time and place and circum-stances, and the trial co rt sustains the objection in question; and plaintiffs obtain leave to amend and supplement, and pro-ceed to do so; and the defendant take; a rule to strike out the amended and supplemental petition, and the rule is discharged; but the trial judge reserves to defendant the right to except thereafter to the amended- supplemental petition, if the same does not disclose sufficient ground of action, and either under the general issue or by peremptory exception; and thereupon defendant, having not only pleaded the exception of no cause of action, but having repeated the same at the proper time, files his answer; and the case is regularly fixed and comes on for trial a second time.

It is the right of the defendant to assume that plaintiff has set forth his case as completely as he can; and it is then competent for

defendant to argue and have passed upon him by the trial court, his exception of no cause of action, and additional peremptory exceptions, and especially the exception going to the foundation of the action, that the plaintiff's petitions are wanting in the particulars and specifications required by law for an action in nullity of a will on the ground of fraud and violence. It is bad practice to refer such exceptions to the merits. C. P. 343-6; 18 An. 643; 19 An. 207; 21 An. 500; 31 An. 680; 38 An. 232, 526; C. C. 1851; Hennen's Dig., pp. 1114-1147; 6 Martin, 510; 7 An. 238-241; Coin de l'Isle, Code Civil, L. III, T. II, p. 86, No. 21; Grenier, Don. and Test., Vol. 1, p. 428, No. 149; Merlin, Rep. Mot. Suggestion 81, No. 2; Toullier, No. 5, 713; Bédarride, Vol. 1, No. 399.

Properly understood, Art. 1492, R. C. C., is also a bar to the allegation of the petition and to the intervention herein, that nullity of the testatrix's testamentary disposition in favor of the defendant results from the ascendancy acquired by him over her in his character of a minister of religious worship in attendance upon her during the illness of which she died. Art. 1492, R. C. C., is to be construed with Art. 1489, R. C. C. The jurisprudence is well established that the provisions of Art. 1489 are entirely without application to the relation of husband and wife. Art. 909, C. N., and Art. 1489, R. C. C., correspond; Art. 1489 is to be construed with Arts. 119 and 1749, R. C. C.; Art. 119, R. C. C., is the same with Art. 212, C. N.; Arts. 1749, R. C. C. and 1096, C. N., correspond; Art. 1091, C. N., and Art. 1736, R. C. C., correspond, and so do Art. 1094, C. N., and Art. 1739, R. C. C.; Demolombe, Don. and Test., Vol. 1, p. 566, No. 543, and authorities therein cited; Marcade, Art. 909, C. N., p. 423, No. 111; Laurent, Don. and Test., Vol. 11, p. 484, No. 353; Ray vs. Broisin, Cassation, 1808; 7 Journal du Palais, p. 121; Bonnet vs. Desordes; 15 Jour. du Palais, 1820, p. 688; Desordes & Guyot vs. Bonnet, 14 Jour. du Palais, 1817, 1818, p. 592; Boyer vs. Damiens de Beaufort, Jour. du Palais, 1819, 1820, p. 580; Demolombe, Don. et Test., Vol. 1, p. 569, No. 545, giving numerous authorities.

The action of an intervenor, who joins plaintiff in a suit in nullity of a testament, is barred if he has already sued the defendant for a partition to enforce a division of property which is held jointly

by the intervenor and the defendant in the character of insti-
tuted heir under the testament attacked.   R. C. C. 1330;  Mayor
vs. Armant, 14 An. 181.

The opinion of the court was delivered by

WATKINS, J.   This is an action for the revocation and annulment
of the will of *Martha Vaughan Gasquet,* deceased wife of the defend-
ant, instituted by her two survivng sisters and one niece, as heirs at
law—it being alleged that the deceased was married to the defend-
ant on the 16th of December, 1886, and departed this life on the 11th
of October, 1891, leaving neither ascendants nor descendants.

The will is olographic in form, and was admitted to probate on the
14th of October, 1891.   It is couched in the following terms, to-wit:

"In the name of God, the Holy Trinity, Amen:

"I, Martha Vaughan Gasquet Percival, in view of the uncertainty
of human life, do make this my last will and testament in holographic
form.

"I give, will and bequeath all the property of whatever kind, real
and personal, movable and immovable; all moneys, assets and effects
which I may possess or own, or have any claim on or interest in at
the time of my death, to the Rev. John Percival, my husband.   I
make him my sole heir, and give to him, my said husband, immediate
and unconditional seizin of my whole estate at my decease.

"This is my good and valid will and testament, and I now revoke
and declare to be null and void any and every other will and testa-
ment heretofore made by me.

"This done in the city of New Orleans, State of Louisiana, this
Tuesday, the ninth day of July, in the year of our Lord 1889.

"The whole written, dated and signed by me personally.

"MARTHA VAUGHAN GASQUET PERCIVAL."

Under the decree of the presiding judge the defendant was recog-
nized as universal legatee under the terms of the testament and in-
vested with possession of the decedent's succession.

The grounds of attack set out in the plaintiff's petition are sub-
stantially of the following purport, to-wit:

*First.* That the testament is not clothed with the formalities re-
quired by law for such an instrument, in that it is not properly dated.

*Second.* That it was not the voluntary act of the deceased, and was

not made the repository of her intentions, because same was pro-
cured by means of undue influence exercised by the defendant in
his own favor, and with the view of supplanting her legal heirs.

To this petition the defendant for answer plead a general denial,
accompanied with the special defence that the charge of undue in-
fluence made against him is an unjust and slanderous charge; and
the averment is made that the will is complete and perfect in every
essential particular and valid in form.

Upon these issues, a trial of the cause was begun, and testimony
was being introduced on the behalf of the plaintiffs when the de-
fendant's counsel objected thereto on the ground that the charge of
undue influence was tantamount to that of *captation* and *suggestion*,
proof of which is inadmissible under Art. 1492 of the Civil Code.
This objection was sustained on the ground that such allegations were
insufficient to authorize the introduction of proof under them, same
being unaccompanied with *specific* charges or facts of fraudulent
practices.

Thereupon the trial was continued on the issue remaining—that is
to say, upon the alleged informality of the testament. Thereupon
the plaintiffs filed a supplemental petition, with the evident purpose
of supplying the defects of their original petition.

In this supplemental petition the plaintiffs make quite an elaborate
statement of the various acts and facts of *fraudulent* captation charged
and among them the following, to-wit:

" That the defendant was at the time of his marriage with testa-
trix and since, professionally attending her as a minister of religious
worship during her sickness of the malady with which she died,
to-wit: tuberculous consumption, and the legacy which the defend-
ant had obtained from his sick wife, instead of proceeding from
conjugal affection, was the result of the abuse of the ascendancy
which he had obtained over her in the exercise of his calling; that
notwithstanding their said marriage, defendant employed unlawful
power over his wife's testamentary intentions to defeat her will and
to perpetuate the pretended will which he had procured from her at
his dictation; that the said Mrs. Percival was fraudulently prevailed
upon and coerced by the defendant to leave him her said estate
under fear of threats and violence, and in her weak condition
of health she was subjected to constant surveillance and restraint up
to her last moments, to such an extent as to deprive her of and destroy

her testamentary capacity; that the will was not left in the keeping of decedent, where she could have access to it, and that she was prevented by every means from exercising her volition as to her testamentary intentions in any manner, or revoking the said instrument, which had been obtained from her by illegal and fraudulent means and had never expressed her true and final intentions.''

About this juncture of time a change occurred in the *personnel* of the judges of the District Court, whereby the judge who presided when the proceedings outlined above occurred, was displaced by the judge who conducted the subsequent pro eedings to final judgment and appeal. Subsequent to this change, defendant filed the following peremptory exceptions, to-wit:

1. That the plaintiffs' petition and the intervention herein being petitions in nullity of the testament of exceptor's wife in favor of exceptor on the ground of defect in the form thereof as an olographic will, and especially as not having been dated by the testatrix, because of the situation in the testament of the date and of the manner of indicating the same, can not be maintained.

2. That the plaintiffs' petition and the intervention herein being petitions in nullity of said testament on the ground of captation and suggestion are barred by Article 1492, R. C. C.

3. That plaintiffs' petition and the intervention herein being petitions in nullity of said testament, as a disposition obtained by means of the ascendancy acquired by him over the testatrix, in his character as minister of religious worship, in attendance upon the illness of which she died, are likewise barred by Article 1492 and Article 1489, R. C. C.

4. That plaintiffs' petition and the intervention herein being petitions in nullity of the testament of exceptor's wife, and charging fraud on exceptor, and fraudulent coercion on his part, in obtaining and the obtaining of said testament under fear of threats and violence, are vague and indefinite and wanting in any and all proper specification of time, place and circumstance.

5. That the intervention herein is barred by the judicial confession of intervenor, Miss Frances Gasquet, who has sued exceptor for a partition.

On motion of defendant's counsel, these exceptions were at once taken up for trial, because they were peremptory in character, and the same were sustained and the suit dismissed, and from the judgment of dismissal the plaintiffs have appealed.

## I.

The preliminary question to be decided is whether the district judge correctly disposed of the exceptions at the *time* he did, or should he have deferred his decision until he decided the merits of the cause.

It is apparent, upon simple inspection, that the exceptions pleaded are of a peremptory character, and founded on the law, and for that reason pleadable during the progress of the trial, which had, however, just begun.

The purport of the exceptions is, first, that the charges preferred are barred and precluded by the terms of Arts. 1489 and 1492 of the Civil Code; and second, that the charges of *fraudulent* coercion are too vague and indefi ite, and so wholly wanting in specification of time, place and circumstance as to render all proof under them inadmissible.

Manifestly these objections were so general and sweeping as to require action on the part of the court at the very outstart, as they appeared at the threshold of the controversy. If, indeed, the matters set out in the petition and amended petition are barred by the law, and for that reason not actionable at all, the judge *a quo* was, by the exception of defendant, charged to determine and decide that question preliminarily. And if in fact the allegations of the petition are too vague, and proof was inadmissible thereunder, certainly the judge was bound to pass upon that question, when the objection was urged against the admissibility of proffered testimony.

The law provides that "peremptory exceptions founded on law are those which, without going into the merits, show that the plaintiff can not maintain his action," etc. C. P. 345.

Such exceptions "may be pleaded in every stage of the action previous to definitive judgment," etc. C. P. 346.

In Jennings vs. Vickers, 31 An. 679, it was held that "an exception which, if maintained, will terminate the suit, ought to be tried and decided *in limine.*"

In Farmer vs. Hafley, 38 An. 232, the court said that it was bad practice to refer to the merits, exceptions which go to the foundation of the action.

Such, indeed, is the settled jurisprudence of this court, and it has been established in the interest of a correct and economical adminis-

Zerega et al. vs. Percival.

tration of justice.   Certainly no reason can be assigned why the trial and final disposition of an exception that may put an end to the case should be deferred to the final trial of the cause, thus inflicting additional cost and expensive delay on the litigants and protracting litigation unnecessarily.

We not only approve, but applaud the action of the district judge in taking up and disposing of the exceptions during the progress of the trial, for if they are maintained in this court, this litigation will be terminated.

II.

First, in order of occurrence as well as in importance of result, if maintained, is the exception that the allegation of nullity of the will for want of form can not be maintained, the averment being, substantially, that it is not dated, and is, therefore, lacking an essential element for its validity.

As the objection, if it be well founded, is plainly and easily discoverable on the *face* of the instrument, it presents a naked qu stion of law as to whether the terms of the will in this respect constitute a *date* in the sense of the code.   Presented in this ligho this objection is the equivalent of the plea of no cause of acti n, and peremptory in character and determinable *in limine*.

The concluding portion of the testament is couched in the following terms, viz.:

"This is my good and valid will and testament, and I now revoke and declare to be null and void any and every other will and testament heretofore made by me.

"This done in the city of New Orleans, State of Louisiana, this Tuesday, the 9th of July, in the year of our Lord, 1889.

"The whole written, dated and signed by me, *personally*.

"MARTHA VAUGHAN GASQUET PERCIVAL."

The question raised by the defendant's exception is, whether the terms of the instrument are responsive to the terms of the law, to-wit:

"The olographic testament is that which is written by the test tor himself.

"In order to be valid, it must be entirely written, *dated* and signed by the hand of the testator.   It is subject to no other form," etc.   R. C. C. 1588.

The contention of the plaintiffs is, that the will has no date within the meaning of the law; and their counsel propound this question, to-wit:

" How can we, therefore, be called upon to supply this date *by appropriating a date out of the body of the will,* as a date required by law, which it lacks ? and, not having a date, how can we accept this instrument as a solemn act of last will and testament, gifted to speak out after death with ' most miraculous organ.' "

A careful perusal of this interrogatory discloses the objection of plaintiffs to be, that the date is defective and illegal, because of its being *in the body* of the testament—exceptants not doubting that the testament was wholly *written* by the testatrix herself, as the following quotation from their brief will attest:

" The impression left on the mind by reading for the first time this will, in the original, is not only that it is not dated, but that it is not the personal act of the testator, although indisputably, *we presume, in her handwriting.*

" The perusal completed, the mind vaguely inquires for the date at the end of the will—and then recurs to the top of the instrument in search of it, and the envelope; then, on further consideration, reverts to *date in the body of the instrument;* during which time the conviction that it is a solemn act of last will and testament is suspended, if not lost, and can not be said to resume moral consciousness in the enunciation in the words ' this   *   *   *   by me, *personally,*' which no testator would think to add to the evidence of hi . own handwriting in the entirety of the instrument; or then to underscore as done, except to expose the intervention of a foreign hand."

But this course of argument is a clear departure from the text of plaintiff's exception in that it is not *solely* based upon the want of a proper date to the instrument, but is made to turn upon the alleged impression that is created on the mind by the *absence of a date* that the *execution* of the will was not the personal act of the testatrix—an altogether different question from the one propounded, viz., that the date given is in the body of the will, and for that reason same is null and void.

Hence the inapplicability of the quotation counsel have made in support of that argument, viz.:

This court has said, in the case of the Succession of Bobb, 41 An. 250:  " In interpretation of a will the first and natural impression

derived from reading the clause involved is entitled to great weight. The writer is not supposed to be propounding riddles, but rather to be trying to convey his idea in the simplest and most natural manner, so as to be correctly understood at first view.''

And for like reason, we think, their reference to Succession of Morvant, 45 An. 208, equally inapplicable.

Neither of those cases involve the question we have here for consideration—the *date* of the testament.

As a confirmation of the statement that the date must be appropriated from the body of the will, the concluding paragraph is pointed to, viz. :

'' The whole written, dated and signed by me, *personally*.''

Given its literal meaning and interpretation, this sentence asserts the truth of the proposition plaintiff's petition denies; for it declares that '' the whole''—that is the will—was '' written, dated and signed'' by the testatrix.

At most, this seems to be a mere repetition of the fact that is made evident by the paragraph immediately preceding it, viz. : '' This done   *   *   *   this Tuesday, the ninth day of July, in the year of our Lord 1889.''

How this mere repetition of the fact that the testament *was dated* can be made to operate as a denial of that fact we can not perceive, unless it be upon the converse of the proposition, that two negatives equal an affirmative.

This *addendum*, occurring as it does after the actual date of the will, is restricted in terms to the declaration of the fact that it was written, dated and signed by the testatrix, and does not make reference to the disposing part of the instrument.   It relates exclusively to the confection of the will, and constitutes no part of the body of it.

*Per contra*, the contention of the defendant's counsel is, that the law prescribes no particular place in the will where the date must be placed, and that, consequently, the date of an olographic testament may be either at the beginning or at the end, or in the body of the instrument itself, provided that it is fairly and plainly inferable from an inspection of the instrument; that it was the intention of the testator that it should have the date in question.   He closes his argument on this question thus:

. '' Whether or not this be the case, must be made the subject of

judicial inquiry in every suit, where the issue has been properly joined and tried; but, whenever relations reciprocal, between the date of the testament and the bequests, are, reasonably speaking, made clear, the mere locality, or the exact situation of the date in the will, the instrument being otherwise valid, is matter of small, if indeed it is of any importance at all."

The district judge entertained the defendant's theory and expressed the following view in his reasons for judgment, viz.:

"Albeit Art. 1588, in stating that the olograph shall be written, dated and signed by the testator, is suggestive of the order to be observed in the preparation of the act, still, as the law has not prescribed in terms the place to be occupied by the date, it is immaterial where it is put. It may be at the beginning, at the end, or even in the context of the act. It may also follow the signature. 27 An. 271, Succession of Fuqua.

"But, in that case, it is for the court to decide whether the date is intended to apply to the testamentary dispositions, or whether it is so far from them as to exclude all idea of its being connected therewith. In the same manner, when the date is in the body of the instrument, the court must inquire whether the date refers to the dispositions which follow as well as to those which precede it, thus making the several parts of the instrument a continuous and congruous entity, or whether the subsequent dispositions are without date, and hence null. Prudence would, therefore, counsel a testator, anxious to place the execution of his last w shes beyond the uncertainty of litigation, to date the will immediately before signing it, but his failure to do so and the writing of the date in the body of the will would not be a cause of nullity. Such is the *consensus* of opinion among the French commentators on Art. 910, Napoleon Code, of which our Art. 1588 is a translation." Rogron, Code Napoleon Annoté, pp. 1001-1002; Marcadé, Ed. 1852, Vol. 4, pp. 6, 7, 8, 9, par. 12 *et seq.*; Zachariæ, Vol. 5, pp. 84-85, Sec. 688; Pothier, Obligations, Vol. 77, p. 277; Duranton, Vol. 9, pp. 30-31, Nos. 31-32; Toullier-Duvergier, Vol. 3, p. 205, No. 369; Dalloz, Vol. 1, Codes Annotés, No. 148, p. 783; Coin d'Lisle, Don. et Test., No. 2, p. 336, No. 30, p. 343.

The will under consideration in Succession of Fuqua, 27 An. 271—to which case the district judge referred—was first signed and then dated, thus:

"MRS. SARAH B. FUQUA.

"*September 12, 1873.*"

Of it the court said:

" We come now to consider whether the instrument above quoted is a will. We are of opinion that it is. It is in the olographic form; entirely written, dated and signed by the testatrix. Objection is made [that the date is not affixed in the proper place. It is not essential that the date to an olographic will should precede the signature. It may be placed below. See Coin d'Lisle under Art. 970, Code Napoleon, No. 30, where the authorities on this point are cited."

The same proposition is quite as distinctly announced in Lagrave vs. Merle, 5 An. 278. In that case the will was dated at the beginning, and signed at the end, and of the complaint made of it the court said, viz. :

" The argument of counsel has been principally directed to the last clause, revoking all former wills, *which comes after the date given to the* closing part of the principal testamentary disposition. This, though in the handwriting of and signed by the testator, has no date appended to it," stating a case much stronger against the will than that stated by the plaintiffs. Of it the court said:

" The case turns on the consequence attending the posterior clause not being dated. The code provides, that for the validity of an olographic will, it must be written, dated and signed by the hand of the testator. It is subject to no other form, and may be made out of the State. Art. 1581. * * * The law not having fixed the place in which the date must be put in an olographic will, it may be placed not only at the head but also at the foot of the instrument and in the body of it.

" A date, though affixed to the first clause, and before the second, may be applied to one as well as to the other, and thus both may be considered as dated and signed. Droit Francais, Lib. 3, Tit. 2, Sec. 34 *et seq.*"

Hence it is quite clear that under the provisions of our own code, as well as under the Napoleon Code, and the jurisprudence of France as well as our own, that the particular position or place of the *date* of a will is not fixed or sacramental, and our conclusion is that the exception of the defendant is well taken, and that same was correctly maintained by the judge *a quo*.

### III.

The *second* ground of exception is, that no evidence is admissible under the allegations of the plaintiffs' petition, wh ch are of the following tenor and effect, to-wit:

" That said Mrs. Percival was *fraudulently* prevailed upon and co-erced by the defendant to leave him her said estate, under fear of threats and violence, and in her weak condition of health she was sub-jected to constant surveillance and restraint, up to her last moments, to such an extent as to deprive her of and destroy her testamentary capacity," etc.—the objection being that the charge of the petition is that of *captation and suggestion*, which is barred under the pro-visions of t e code.

The code declares that " proof is not admitted of the dispositions having been made through hatred, anger, suggestion or captation" (R. C. C. 1492 [1479] ) ; and the argument of defendant's counsel is, that the allegation that the testatrix' testamentary capacity was destroyed by the persuasive power and coercion of the defendant, and by the constant surveillance and importunities of the defendant, up to her last moment, is, in effect, a charge of suggestion and capta-tion in the sense of that article.

The learned judge of the District Court, in the course of his exam-ination of this case, gave due attention to this question, and, in his reasons for judgment, employed the following language, which we adopt as our own, as the views expressed are both clear and forcible, viz. :

"Is undue influence a cause of a nullity of testaments? Undue influence is an expression unfamiliar to civilians. It is borrowed from a system of law not prevalent in Louisiana, and it is there used in the same sense as captation and suggestion in the civil law. Schouler on Wills, pp. 230, 231, Sec. 227.

"When, therefore, plaintiffs in their petition allege undue influence, they must be understood as alleging captation and suggestion. Cap-tation has been defined as the act of one who succeeds in controlling the will of another, so as to become master of it. Captation takes place by those demonstrations of attachment and friendship, by those assiduous attentions, by those amenities, by those caresses, by those ready services, by those officious little presents, usual among friends, and by all those methods which, ordinarily, render us agreeable to others, and enable us to secure their good will. Sug-gestion is often used as a synonym for captation, but it is applied specially to those means of persuasion employed to alter the will of a testator, and to prompt him to make a disposition different from that which he had in view. Bouvier's Law Dictionary, verbo Capta-tion; Furgole, Vol. 1, p. 131."

An examination of *Bouvier* fully attests the accuracy of the judge's definition; and as Abbott's Law Dictionary gives no definition whatever of the word *captation*, that of *Bouvier* is controlling.

Simplified, the question is, whether under the code it was permissible for the plaintiff to make proof of *undue influence* having been employed by the defendant in superinducing the testatrix to make the testament in his favor, for the purpose of procuring its annulment.

If the term " undue influence " comes within the meaning of the term " captation and suggestion," then the offered evidence came within the reach and prohibition of the cited article of the code.

When the case was first on trial, the judge then presiding held that an objection *then* taken to that effect was well grounded, and disallowed the testimony.

And, subsequently, the plaintiffs amended their petition and made the averment above quoted, of *fraud*, as having accompanied the undue influence exercised—doubtless with the object of meeting the views entertained by the judge then presiding; and which are as follows, viz.:

" Undoubtedly," said the judge, "undue influence is sufficient to annul a will, when it is proven that undue influences have operated; but undue influences must be indicated in the proceedings by specific acts of malpractice or fraudulent practice, and showing that the intention of the testator was thereby deceived, and that the disposition is therefore tainted with fraud "—his theory being that the plaintiff could overcome the prohibition of the code by making specific charges, or facts of fraudulent practices, in the employment of the " undue influence " used; or, in other word , the prohibition of the code is directed against *simple*, and not against *fraudulent* captation.

But, after the *personnel* of the District Court had been changed, the judge taking the bench subsequently entertained a different view— holding that the terms of the code are general, and not susceptible of the distinction his predecessor had given it. In the "reasons for judgment" the trial judge assigned, this question was carefully and comprehensively treated, and they are well worthy of reproduction. Said he:

" Art. 1492, R. C. C., provides that ' proof is not admitted of the dispositions having been made through hatred, anger, suggestion or captation.' The language of this article is plain and unambiguous,

and the rule of exclusion which it formulates would seem to admit of no exception. But counsel for plaintiffs, arguing in the same manner as my esteemed predecessor, contend that Art. 1492 is merely declaratory of what the jurisprudence was in France formerly, and what it was in the State of Louisiana at the time of its adoption, and that it prohibits the evidence of simple captation and suggestion, but does not embrace questions of fraudulent captation or fraudulent suggestion.

" When this argument was first addressed to me, impelled by a sense of deep respect for the great erudition and the ponderous logic of the magistrate by whom it was advanced, I was inclined to concede its soundness. Further reflection, however, and a careful and searching review of the French commentators have led me to a different opinion. I find that from time immemorial, under the ordinances and customs of Paris, captation and suggestion were causes of nullity of testamentary dispositions; but at no time was the nullity decreed, unless captation and suggesti n were accompanied by fraudulent practices capable of leading the testator into almost invincible error regarding those in whose favor he wished to make his will. The reason was that, albeit the kindly offices, th  cajolery, the flattery, the presents, and the many other demonstrations of feigned friendship usually resorted to by cupidity, are repugnant to honesty and good conscience; still human laws have not affixed a penalty thereto   They could not do so for captation, because the springs of human action are hidden in the secret of the heart; because tru  devotion, sincere friendship and the sacrifice of one's future to an aged relative or to a suffering being abandoned by others, too often bear the semblance of low sycophancy, of simulated friendship and of interested self-abnegation; because benefactions should not, like contracts, be measured by the principles of exact justice; and because it is ofttimes useful for individual happiness that private interest should make closer the ties of affection, that sickness, infirmity, old age, incompatibility of temper would otherwise destroy. Nor could human laws visit a punishment upon suggestion, because suggestion is nothing more than persuasion; because one may seek advice from strangers in making liberalities, as well as in business affairs; because the obsessions of a stranger, although pressing and importunate, are nothing more than obsessions, and far from destroying the will of him who yields, tend

to shape it; because an act is not the less voluntary for being or gi-
nally suggested by some one else. Coin d'Lisle, Don. et Test.,
pp. 84, 85.

" But when the captator coupled his manœuvres with fraudulent
practices; when he resorted to defamation and calumny to estrange
the testator from his rightful heirs; when he used unlawful means to
keep them aloof; when he confined the testator and denied him in-
tercourse with the outside world, then the law, considering that
fraud was the cause, while captation and suggestion were merely the
means, intervened and directed the annulment of the tainted dispo-
sition. Demolombe, Don. et Test., Vol. 1, p. 413.

" Such was the established jurisprudence in France when Napo-
leon, first consul, being desirous of codifying the laws of that great
nation, confided this task to a government commission composed of
Tronchet, Portalis, Mallville and Bigot-Preameneu. In the *projet*
prepared by these eminent jurists there was an article in these
words: ' La loi n'admet point la preuve que la disposition n'a ete
faite que par haine, colère, suggestion, ou captation.' It was there-
by intended, as stated by the commentators, to drain the source of
those scandalous suits which recurred so frequently before the
courts. Not that French judges readily received evidence of capta-
tion and suggestion; not that litigation of that character was
encouraged or looked upon with favor; on the contrary, although
the suits were numerous, so difficult was it to make satisfac-
tory proof that instances of success were very few. But the
accursed greed of gold, once it has entered the human heart,
rules it with relentless sway, and stops at nothing short of
crime to save itself; and disappointed relatives, whose long-
cherished hopes of securing a fortune have been rudely dis-
pelled, will not hesitate, when they can not attack a will for
any other cause, to trump up a charge of captation, and
upon the most frivolous pretext exhume the testator and heap
upon his memory the most insulting accusations. His private life,
his habits, his secret thoughts, nothing is respected, but everything
assumes, at the will of an ardent polemic, the most odious coloring.
(Mr. Attorney General Delangle before the Court of Cassation.)
This is precisely what the framers of the *projet* of the Code Napoleon
wished to prevent. But when the article of exclusion prepared by
them came up for discussion in the government halls, it met with

39

strong opposition. The argument which claimed that, if it was inserted in the code, fraud would find in the law itself a title of impunity and would be encouraged and emboldened, finally prevailed. The measure was voted down. The Code Napoleon remained silent on the subject, and, in the absence of contrary legislation, the jurisprudence which allowed proof of captation and suggestion only when coupled with fraudulent practices, continued undisturbed. Bédarride, Dol et Fraude, Vol. 1, p. 392, No. 389; p. 396, No. 392. Demolombe, Don. et Test., Vol. 1, p. 409; par. 382, p. 410; par. 384, p. 412, par. 385, p. 413; par. 386. Grenier, Traite des Donations, pp. 423-4-5-6. Zachariæ, Vol. 5, pp. 50-51. Laurent, Vol. 2, Editio Parva. Furgole, Vol. 17, p. 133.

" It thus appears that Art. 1492, R. C. C., was not taken from the Code Napoleon. It is a literatim translation of the article contained in the *projet* of Tronchet and his colleagues. It was borrowed therefrom. It was first inserted in the code of 1808, known as the Old Code. At the time that code was adopted, March 31, 1808, the Code Napoleon, then called the Civil Code of France, had been in force for more than four years, and the makers of our code had had the benefit of the debates which preceded the enactment of its prototype in the French council of State and legislative body, so that when our legislators embodied in the Old Code the provision that ' proof is not admitted of captation and suggestion,' they must be held to have done just what Tronchet and the other authors of the *projet* desired, and what the French law-makers declined to do—*i. e.*, close the temple of justice against all suits of nullity for cause of captation, whether unaccompanied or coupled with fraudulent practices. Their intention could not have been merely to declare what was the jurisprudence in France or in Louisiana at the time; on the contrary they must have meant to protest against it, to condemn it and to forever banish from the courts a species of litigation which, except in very rare instances, originates in disappointment, rancor or covetousness; which offers a strong temptation for perjury and subornation of perjury; which feeds on scandal and calumny, and which penetrates within the charnel house to pour obloquy upon the ashes of the departed. Our State reports, be it said to the credit and honor of our people, and in proof of the wisdom of our law-givers, are almost barren of cases of this description. The only two to which I have been referred, 9 La. 469 and 35 An. 163, appear to be in accord with the views here expressed.

I am, therefore, clearly of the opinion that whether undue influence be understood to mean simple captation and suggestion, proof of neither being admitted under the textual provisions of Art. 1492, C. C., defendant's exception of n) cause of action in this respect, too, is well founded and must be maintained."

Following the course of the judge's argument we find it fortified both by the history of the article under consideration and by the two decisions to which he refers.

The article appears in the Code of 1808, exactly in its present form. *Vide* Art. 18, p. 212, Digest of the Civil Law.

Then as now the article is found in the chapter that treats " of the capacity necessary for disposing of and receiving by donation *inter vivos* or *mortis causa.*"

Evidently no change of purpose has taken place on the part of the Legislature since the establishment of the State government in respect to this article, and as there is no corresponding article in the French Code the conclusion seems to be irresistible that the framers of the Code of 1808 contemplated and intended a change in the body of the law, and this necessitated a departure from the French jurisprudence on the question of captation and sugg stion. Consequently a review and discussion of that jurisprudence, and an examination and comparison of reatises of French authors on the question, would not subserve any useful purpose, but, on the contrary, it might serve to confus the discussion and divert attention from the simple theory of our own code to the duplex theory of captation and suggestion, that prevails in France—fraudulent captation and suggestion being regarded as a dependency of the statutes of fraud.

This question arose in an early case—Chamdon's Heirs vs. Bongue, 9 La. 468—wherein the will was attacked on various grounds, and *inter alia*, on the ground that the testament was not free and was the result of fraud, and of moral constraint, and the court disposed of the question by making the statement " that it is no longer permitted by our law to attack a testament on the ground that its dispositions were the result of suggestion, hatred, anger and captation, Art. 1479" —thus indicating very clearly that the terms of the code are to be strictly construed. And what is particularly noticeable in the opinion in that case is the close similarity of the facts therein given to the case stated by the plaintiffs.

In Godden's Heirs vs. Executors of Burke, 35 An. 160, the iden-

tical question here presented was there examined and decided—the will being attacked on the ground that it was obtained through undue influence, and the defence being that such charge is not susceptible of proof under the law of Louisiana.   The court disposes of the issue thus squarely raised in the following clear and concise terms, viz.:

" It is an error to suppose that this article (1492 R. C. C.), which was first incorporated into the Code of 1808, and which finds no place in the Napoleon Code, was designed to prevent the admission of proof to establish the circumstances which transpire *at* the making of an authentic will, under charges tending to the nullity of the act, for want of compliance with the exigencies of the law.   The prohibition embodied in that article against the admissibility of certain proof was intended to apply only to facts arisen *prior* to the making of the will and to close the door effectually against inquiries into the *motives* which animated the test tor in disposing of his property."   Or, in the further language of the court, the object of the compilers of the code was to preclude all evidence of acts, conduct or motives of the testator *antecedent* to the making of the will, as exercising influence over the testamentary dispositions therein contained; but same were not intended to prevent the admission of proof of what occurred *at the making* of the testament.

For, say the court, " unless it was so, it would ever be impossible to prove that the *dictation* was the result of intimidation, fraud, or some other ill practice; or to establish some other fatal irregularity."

The test which that decision establishes is that the *date* at which the *undue influence* is exercised, and the *object* it is designed to accomplish, and not to the *character* of the *undue influence* used, must control—the purpose of the prohibition being " to close effectually the door against inquiries into the motives which animated the testator in disposing of his property."

In a recent case, the Illinois court had under consideration a precisely similar charge of nullity against a will—Pooler vs. Christman, 34 N. E. Rep. 58—it being alleged by the complainant that the testator, " in executing the (will) was, in fact, under *improper restraint and undue influence* from the said *acts and fraudulent practices* " of the persons named.   .

In disposing of that question the court said that the first cl use of the instruction (to the jury) directing them that fraud and undue influence which should render a will invalid must be connected with

the *execution* of the will, and operating at *the time the will is made*, is sustained by Brownfield vs. Brownfield, 43 Ill. 147," and other cases cited; and that opinion is strictly in accord with that announced in the *Burke* case.

The supplemental petition will be scrutinized in vain for any allegation to the effect that "undue influence" was by the defendant exerted upon the testator *at the time of making the will*, to-wit: the 9th day of July, 1889.

On the contrary, the averment is that defendant " employed unlawful power over his wife's testamentary intentions to defeat her will." Also, that "in her weak condition of health she was subjected to constant surveillance and restraint *up to her last moments* to such an extent as to deprive her of, and destroy her testament ry capacity." Now, in view of the fact that the will was *executed* on the 9th of July, 1889, and the testatrix died on the 11th of October, 1891—two years and three months *subsequent*—any evidence in support of the charge made is impertinent and inadmissible.

Our conclusion is quite clear that this exception of the defendant was well taken, and in sustaining it the judge-*a quo* decided correctly.

## IV.

The charge of the supplemental petition at which the *third* exception is directed, is that the testamentary disposition in defendant's favor was obtained by means of the ascendancy he had acquired over the testatrix in his character as minister of religious worship whilst he was in attendance upon her during the illness of which she died— plaintiffs' averment being " that the defendant was, at the time of his marriage with the testatrix, and at all times since, professionally attending her as a minister of of religious worship during the sickness of which she died," and that the disposition of the will in his favor " was the result of the *abuse* of the ascendancy which he had obtained over her in the exercise of his calling," etc.; the defendant's objection to evidence in support of it being that same is barred by Arts. 1489 and 1492 of the code.

Both of these articles occur in the same chapter and title of the code which treat of the capacity of disposing and receiving by donations and testaments. Therefore it will be unnecessary for us to rep at anything that has been said in regard to the admissibility of evidence to prove that a testament was made through suggestion or

captation on the part of a beneficiary therein, and we will consequently confine our argument to the effect of Art. 1489, upon the averment and proofs of the plaintiffs.

The following is the text of that article, viz.:

"Article 1489 (1476): Doctors of physic or surgeons, who have professionally attended a person during the sickness of which he dies, can not receive any benefit from donations *inter vivos* or *mortis causa*, made in their favor by the sick person during that sickness. To this, however, there are the following exceptions:

"1. Remunerative dispositions made on a particular account, regard being had to the means of the disposer and to the services rendered.

"2. Universal dispositions in case of consanguinity. The same rules are observed with regard to ministers of religious worship."

Plaintiffs' theory is that the terms of the article *absolutely exclude* a minister of religious worship, professionally attending the testatrix during the sickness of which she dies, from receiving any benefit from testamentary dispositions made in his favor during that sickness, and their contention is that the presumption of the code is a conclusive presumption of law that can not be destroyed by countervailing proof, and that the beneficiary minister, in order to sustain a legacy in his favor, will not be allowed to prove that the reprobated disposition was voluntary.

*Per contra*, the argument and contention of defendant is that Art. 1489 must be construed with Arts. 119 and 1749 of the Civil Code, and that thus construed an exception is created in favor of the *husband* of the testatrix, notwithstanding he be a minister of the gospel.

That is to say, that although, as a minister of the gospel, a donee under the testament, has professionally attended the testatrix during the sickness of which she afterward dies, he will not be deprived of any benefit from donations made in his favor during that sickness, if he be the husband of the testatrix, the law declaring that the husband *owes* to his wife "fidelity, support and assistance" (R. C. C. 119); and plaintiffs' averment being, "that the defendant was, *at the time of his marriage, and since*, professionally attending (the testat ix) *as a minister of religious worship*, during the sickness of which she died," etc.

Counsel for defendant has very succinctly stated the theory of the defence in his brief as follows, to-wit:

"The conclusion to be derived from consideration of the different articles of the code appears to be an unavoidable one. Mutual fidelity, support and assistance are enjoined by Art. 119 upon the husband and wife. Their relations, each to the other, presuppose as much. Such being the nature of the article, it would be inconsistent with it, to affect with incapacity the particular spouse, who may have bestowed care and given comfort in affliction to the other. In point of fact, to do this would be to condemn and punish the discharge of duty.

"The civil law does not do violence in this way to the natural law. On the contrary, the natural law introduces the civil law and travels along with it. The influence of the husband over the wife, when he happens to be a minister of the gospel, is no more to be apprehended than is any other devoted and pious relation of human existence. The influence in question, if subversive of liberty at all, should be guarded against, not only in case of illness, or when the husband appears in this or the other part in the drama of life, but must be controlled by some rule of daily use and of universal application.

"It is just this which the law has attempted. It would have been unwise, if not impossible, to forbid all donations or acts of liberality between spouses. The code, therefore, has taken the proper precaution in the premises, by declaring that all donations between married persons, made during marriage, should remain revocable. R. C. C. 1749. It is, then, in the proper interpretation of Art. 212 and of Art. 1749, and in the application and enforcement of both of the articles, to the facts and circumstances as they arise, that the security of the married parties is to be sought, and not in the false theory upon which plaintiffs have proceeded, of danger to society from the devoted relations of man and wife."

Our attention has been attracted to other articles of the code as illustrative of the reciprocal rights of the spouses in the matter of their power to dispose of property by gratuitous title generally.

One of them provides that the spouses " can, by marriage contract, make to *each other*, reciprocally, or the one to the other, what *donations* they think proper, under the modifications hereinafter expresed." R. C. C. 1743; the corresponding article of the French Code being 1091.

Another of them provides that " one of the married couple may, either by marriage contract, or during the marriaga, *give to the*

*other*, in full property, all that he or she might give to a stranger.''
R. C. C. 1746; the corresponding article of the French Code being
1094.

And the support which the provisions of these articles bring to
the defendant's theory is that, notwithstanding the law imposes
upon the husband the duty of fidelity, support and assistance, as a
*debt* of the spouse, yet it, at the same time, permits the wife, during
the marriage, to make a donation to the husband, in full property,
of all that she might give to a stranger—thus illustrating the theory
of the law to be, that the duties and relations of the spouses *inter se*
do not operate as an obstacle to the exercise of testamentary capac-
ity by one in favor of the other, and that this theory, when con-
strued with the provisions of Article 1489, negatives its denuncia-
tion in respect to a minister of religious worship when he is at the
same time the husband of the testatrix.

These articles are in keeping with the provisions of Article 1749,
making donations, whether *inter vivos* or *mortis causa*, always revo-
cable, and conferring upon the wife the power of revoking ''without
her being authorized to that effect by her husband or a court of
justice,'' this free and unrestricted power of revocation being the
fair equivalent of the power of testamentary disposition.

Our attention has also been called to the fact that Art. 212 of the
French Code corresponds with Art. 119 of our own code; Art. 909 of
the former with 1489 of the latter; Art. 1091 of the former with Art.
1744 of the latter; Art. 1094 of the former with Art. 1746 of the lat-
ter, and Art. 1096 of the former with Art. 1749 of the latter—thus
rendering an examination of the French jurisprudence permissible,
if not necessary.

Referring to the treatise of Marcadé on Donations and Testaments,
we find his commentary on the foregoing articles of the French Code
to favor the defendant's theory—from which his counsel's argument
is chiefly drawn—and, inasmuch as the learned judge of the District
Court accepted this author's interpretation of the French law, and,
in connection with his own ''reasons for judgment,'' has furnished
a translation of the text, we have reproduced it, as follows, to-wit:

'' Art. 1489, R. C. C., provides that ' doctors of physic or surgeons
who have professionally attended a person during the sickness of
which he dies can not receive any benefit from donations *inter vivos*
or *mortis causa* made in their favor by the sick person during that

Zerega et al. vs. Percival.

sickness.  To this, however, there are the following exceptions: (1)
Remunerative dispositions made on a particular account, regard
being had to the means of the disposer and to the services rendered.
(2) Universal dispositions in case of consanguinity.  The same rules
are observed with regard to ministers of religious worship.'  Does
the incapacity created by this article attach to the physician or min-
ister, who is also the husband of the testatrix?  The question is new
in our jurisprudence, but not so in France.  Art. 909 of the Code
Napoleon is, in terms, identical with our Art. 1489.  In his commen-
taries thereon, Marcadé, with his usual lucidity of exposition, says:
' All authors concur in the opinion that the prohibition of Art. 909
is not intended for the doctor or minister of worship who may be the
husband of the person who has made her will during the sickness of
which she died, and it has been so decided by the Court of Cassation
on August 30, 1808.

 " 'And, in fact, as Art. 212 imposes upon each spouse the obligation
of personally assisting the other, to strike the husband with incapacity
for having given his care and services to his wife would be to punish
him for having performed his duty.  Besides, between spouses, the
captation, the extreme influence of one over the other, is not more to
be feared in case of sickness and because of the services which the
husband may render as a doctor or as minister than it is in all cir-
cumstances of life.  It is every day, and in all those moments of out-
pouring of the heart and of confidential intercourse, that that in-
fluence subversive of freedom is to be dreaded.  Hence, between
spouses, it was not a special rule founded on sickness or on this or
that quality of the husband that should have been established.  It
was by a general rule of daily application that the effects of the too
great influence of one spouse over the other had to be prevented,
and this is what the law has done. . But as it was impossible to pre-.
vent all liberalities between husband and wife, the code has deemed
it a sufficien safeguard to declare that every gratuitous disposition
between spouses shall be revocable at the will of the disposer, as in
cases of testaments.  And even though the marriage of the doctor or
of the minister should have taken place during the malady of which
the testatrix died, and in the course of which liberalities were made,
it is clear that, inasmuch as the marriage is valid and must produce
all its effects, the rules which we have indicated would apply, since
they are among the effects of marriage.  But this rule is subject to

exception if it be shown by the heirs of the testatrix that the marriage was contracted solely to escape the prohibition of our article; in that case the liberalities would be annulled at the death of the sick person, because the infamous conduct of a man who has entered into the holiest of covenants for the sole purpose of accomplishing his shameful designs could not relieve him of his incapacity under the law. The principle and the exception are justly consecrated by jurisprudence.' Vol. 3, p. 408, No. 530.''

The judge also makes quotation from Demolombe to the following effect, viz. :

'' By the terms of Art. 212 the husband owes assistance to his wife. Thence flows the duty and the right to give her his services during sickness. It would be revolting to say that the husband should then keep away from his wife and abandon her, in order to preserve his title to the evidences of her tenderness and gratitude. *Ergo*, since the husband who attends or who assists his wife in sickness by so doing fulfils one of the noblest duties of marriage, it is impossible that the legislator should have stricken him with incapacity by reason of the very accomplishment of that duty. And the legislator has not done so. On the contrary, he has by special provisions regulated what liberalities may be made between spouses, whether by marriage contract or during the marriage. Those provisions embody a complete order of principles on that subject, and apply in all cases, and to all husbands without distinction, whatever be their calling, doctor, minister of worship, or other, and in whatever situation they may be. Whence it follows, as has been said by the Court of Cassation, that it was not for husbands that the prohibition contained in Art. 909 was established.'' Demolombe also holds that the fact of the marriage having been solemnized and of the testament having been made during the last sickness of the testatrix does not alter the rule; provided, however, that the physician or the minister of worship has not married the sick person for the sole purpose of fraudulently eluding the incapacity resulting from his calling. Demolombe, Don. et Test., Vol. 1, p. 556 *et seq.*, No. 543 *et seq.*

To the same general effect are the following authors, viz.: Vazeille on Donations and Testaments, Vol. 2, p. 135; Toullier, ditto, Vol. 3, p. 29, No. 66; Troplong, ditto, Vol. 2, pp. 234, 235; Coin d'Lisle, ditto, Vol. 1, p. 106.

This theory is enforced by Demolombe in the following terms, to-wit:

" 1. Aux termes de l'article 212, le mari doit assistance à sa femme; et de la résult le devoir et le droit aussi sans doute! de lui donner ses soins dans ses maladies; il serait révoltant de dire que le mari devrait alors s'éloigner de sa femme, et la délaisser, précisément afin de conserverses titres aux témoignages de sa tendresse et de sa reconnaisance. Donc, puisque le mari, qui soigne ou qui assiste sa femme, remplit ainsi l'un des plus nobles devoirs du mariage, il est impossible que le législateur l'ait frappé d'incapacité à raison même de l'accomplisement de ce devoir.

" 2. Aussi, n'en est-il rien; le législateur au contraire, a réglé par des dispositions spéciales, ce vui concerne les libéralités entre époux, soit par contrât de mariage, soit pendant le mariage (Art. 1091 et suiv) ; ces dispositions forment un ordre de principes complêt sur cette matière, et qui s'appliquent dans tous les cas et à tous les maris sans distinction, quel que soit leur état, médecins, ministres du culte ou autres, et dans quelque situation qu'ils puissent se trouver; et il en résulte, comme la Cour de Cassation l'a dit fort justement, que ce n'est pas pour époux qu'a été établie la prohibition contenue dans l'article 909." Demolombe, p. 556, No. 543.

That author expresses the idea to be, that it is not the *minister* of religion who would be deemed incapable of receiving testamentary dispositions, but the *husband*, if the strict interpretation of Article 909, C. N., contended for, prevails; as, in such case, the husband's influence is far greater over the wife than that of the minister can possibly be. Laurent, Vol. 2, p. 484.

In French jurisprudence Rey vs. Broisin is considered the leading case, and upon which the discussions of French authors have chiefly turned. *Vide*, 7 Journal du Palais, p. 121.

Subsequent decisions of the Court of Cassation, while differing therefrom in some respects, have, with general unanimity, affirmed the principles announced therein. Bonnet vs. Dusordet, 15 Journal du Palais, 689; Dusordet vs. Bonnet, 14 Journal du Palais, 592; Boyer vs. Damiens, 17 Journal du Palais, 580.

The only exception stated in those decisions to the applicability of Marcadé's theory is that of a man who marries a woman in fraud of the law, or " with the fraudulent design of defeating the incapacity established by law."

In Rey vs. Broisin, the Court of Cassation say:

" Whereas, the Civil Code, by Art. 1094, empowers the spouses to

give to each other reciprocally within the limits therein set forth all that they may dispose of in favor of a stranger; whereas, Art. 212 imposes upon the spouses the mutual duties of fidelity, support and assistance, whence it follows that it was not for husband and wife that the prohibition of Art. 909 was established; and, whereas, the application of that prohibition was not formally asked before the lower court, as should have been done, the appeal is dismissed," etc.

In that case it appears that a girl who was afflicted with *phthisis*, married her attending physician. A few weeks after the marriage she made a public will by which, after making a few special legacies, she left the bulk of her fortune to her husband as universal legatee. Her brothers brought suit to revoke the will on the grounds, first, that the marriage was a simulation intended to evade the provisions of the law relative to the prohibition against physicians attending persons during their last illness; second, that even if the marriage be valid and legal, the husband being at the same time the physician attending his *fiancé*, the prohibition of the law invalidates her subsequent testamentary disposition in his favor. It was upon these propositions that the judgment of the court was pronounced.

In Bonnet vs. Dusordet, 15 Journal du Palais, 689, the Court of Cassation held that, *if*, under Arts. 1091 and 1094 of the Civil Code, the physician who treated a person during the sickness of which she died, and who married her during the course of her illness, can legally take donations made to him during that interval, it is because these donations are presumed to have been freely made by reason of conjugal affection; but it is otherwise when the donations are *shown not to have sprung* from this affection and free consent, but that they had *no other cause than the influence which the physician had over the patient*, and the *abuse* of this influence by the physician, to obtain these donations from her during her last moments.

It was upon such a state of facts as is contemplated in this last paragraph having been alleged and proven that the donation under consideration in that case was revoked and set aside.

In Dusordet vs. Bonnet, 14 Journal du Palais, 599, the court held that, conceding, in the *first* place, that it clearly appears from all the evidence in the case that the marriage contracted on the 14th of October, and the subsequent universal testamentary bequest of the 18th of the same month, took place during the sickness of which the testatrix died; and, in the *second* place, that the husband had been

originally the only physician of the widow whom he married, and, after he had married her and called in other physicians, that he was the habitual physician and attendant in whom she placed confidence, and that he was thus brought within the prohibitive terms of Art. 909 of the code—hence it was impossible for the legatee to be released therefrom by means of a marriage which was evidently contracted entirely for the purpose of escaping from that prohibition. In that case the donation was annulled and set aside—the wife having died just one month and two days after the marriage.

In Boyer vs. Beaufort, 17 Journal du Palais, 581, the court had under consideration an ante-nuptial marriage contract which the collateral heirs sought to revoke on the ground that the husband of the deceased having attended her as physician previous to her marriage while she was suffering from the illness of which she died, he was incapable of receiving anything from her by such contract. Notwithstanding the court sustained the defendant's plea of ten years' prescription—treating the action as one of rescission—yet they held that if the law prohibited physicians from receiving donations from their patients, it was only in cases where a dangerous influence had brought about these donations, and not where they were freely and voluntarily made, in view of a marriage which actually took place subsequently—the donation, in this last event, possessing a legitimate cause, was secure from attack.

Vazeille defines the articles of the French Code thus:

"Article 909 does not make an express exception for the *husband*, who being a physician gives to his wife the aid and assistance of his art; but Article 212 establishes between spouses the reciprocal obligations of aid and assistance, and Article 1904 authorizes them to make donations to each other. From all which it has been properly concluded that the husband, who is a physician, performs a *duty* in employing his art and in giving his attention and care to the treatment of his wife when sick, and that his profession of physician or surgeon ought not to make him *lose* the right which all other husbands have to the donations from his wife. But it has been held that a marriage which took place during the sickness of the wife for the purpose of getting rid of the prohibition of the law ought not to have the effect of validating the donation otherwise void." 2 Vazeille's Donations and Testaments, p. 135; C. N. 909; *vide* M. Grenier, No. 127; Toullier, No. 66; Duranton, No. 257; Dalloz, Chap. 2, Sec. 7, No. 9.

Zerega et al. vs. Percival.

As Duranton has well said: "Unworthiness should not cover or shield incapacity."

Toullier states that physicians who give to their wives the care and assistance of their art are excepted from the prohibition.   Article 1094 gives the spouses the power of giving and receiving, without excepting husbands who are physicians.   Under Article 212, spouses owe to each other reciprocally aid and assistance.   This is sufficient to establish or prove that the general prohibition of Article 909 does not strike or attach to husbands who are physicians.   3 Toullier's Donat. and Test., p. 29, No. 66.

The foregoing ample citations from the French Code and jurisprudence, as well as from the treatises of French commentators on the Code Napoleon, clearly show their concurrence in text, as in opinion, with our own code and jurisprudence.

After a careful examination of this interesting subject, in all of its bearings, we have reached the same conclusion at which our learned brother of the District Court arrived—that the plaintiffs' complaint of the testamentary disposition being null, on account of the supposed ascendancy the defendant had acquired over his deceased wife, by reason of the influence he exerted over her as a minister of religious worship, is barred by the provisions of Articles 1489 and 1492 of the Revised Civil Code.

### V.

Considering the authorities cited and the views that are expressed in paragraph 3, *supra*, to the effect that the framers of the code intentionally closed the portals of justice against " all actions of nullity for cause of captation, whether unaccompanied or coupled with fraudulent practices," it is immaterial for us now to inquire whether the allegations of plaintiffs' petition in this regard are full and complete, or vague and indefinite.   And it is likewise equally unimportant for us to inquire whether the intervention is barred by certain antecedent judicial admissions or not.

Altogether the case has been examined and disposed in a manner comporting with the important questions and large values involved, and the high character of the defendant as a minister of religious worship; and we feel justified in saying that none of the charges preferred are tenable in law.

Judgment affirmed.

Rehearing refused.