BKEAUX, J.
Mrs. Pauline Jacobs, wife of Thomas B. Jacobs, of this city, died testate. She left property valued at about $70,000. Her husband owned very little of the world’s goods. He was a sick man. Her legal heirs brought this suit for the annulment of her will.
She was married to Thomas B. Jacobs in the year 1882. There are no children issue of the marriage. Her legal heirs are her aunts, cousins, and an uncle in Germany.
For some time prior to her death she was an invalid, and absent for medical treatment in Mexico, Battle Creek, Mich., and Chicago.
While she was a patient in a sanitarium at Guadalajara, Mexico, she made'a will in the olographic form, dated February 12, 1900, in which she bequeáthed all of her property to her husband (except the cost of a tomb to be erected to receive the remains of her late father and his immediate family, her husband, and herself).
The climate of the mountains of that country was not favorable to her recovery. She and her husband left for Battle Creek, Mich. At San Antonio they were met by Dr. C. W. Jacobs, a brother-in-law of the testatrix.
In passing through New Orleans they stopped, because of the physical condition of the testatrix, for a day or two, at a hotel. They did not repair to their home in that city.
A few days after her arrival at the Battle Creek Sanitarium her attending physician found that her illness was tuberculosis of the intestines. He advised to take her to another place for medical treatment, as it seems that they are not thoroughly prepared at the Battle Creek Sanitarium to take charge of patients suffering with the disease before mentioned.
She was brought to Chicago, and there placed in a maison de santé. When about to leave Battle Creek some misunderstanding arose about necessary funds to defray her expenses, which caused her some displeasure and irritation. She was of a nervous temperament. She wrote to her aunt, one of the plaintiffs, to come and take her home; that her husband had left. In the same strain she wrote to a cousin.
A short time after her arrival at Chicago, while a patient at the Mercy Hospital, she wrote another will, and bequeathed the bulk of her property to her relatives, and a house and lot to her husband.
About this time the aunt before referred to, alleging that the testatrix was unduly restrained of her liberty by the husband and brother-in-law, that she was confined in the Lake Side Hospital in the city of Chicago, and that her relatives were not permitted to see her, sued for a writ of habeas corpus.
The authorities of the hospital were also made parties defendants.
The judge to whom the writ was addressed as a witness testified that he deemed it proper to appoint a reputable physician to examine Mrs. Pauline Jacobs, and to ascertain her mental and physical condition, and to ascertain whether or not she was unduly restrained, as alleged in the petition for a habeas corpus.
The physician appointed testified at some length, and on his report, and after a personal examination at the hospital by the judge into the facts charged, the court declined to grant the application. We excerpt the following from the testimony of the physician, Dr. Wm. E. Quine, dean of the College of Physicians and Surgeons of Chicago. He called professionally on Mrs. Jacobs in June, 1900, and examined her in consultation with Dr. Henderson, who is the medical head of the institution, viz., the Mercy Hospital:
“Acting under the instructions of Judge John Gibbons, I also interrogated Mrs. Jacobs as to the status of relations to her husband. She told me there was no estrangement between her and her husband. I asked her if she had any objections to her husband’s visiting her. She told me that she would be glad to have him visit her. I asked her if she would object to living with her husband. She told me she would not, provided she could have peace and freedom from annoyance. I asked her why she made the condition as to peace and protection from annoyance — whether or not it was her husband who annoyed her. She answered that there was a family quarrel in relation to the estate which she was expected to leave when she died. I asked her if there was *1015 any estrangement or quarrel between ber and ber other relatives. She told me there was not; that she loved her relatives; but they annoyed and excited and pestered her by exciting conversations referring to her estate and to her husband. She was on all three occasions [referring to his different visits) of a disposing mind and memory.”
After the will before referred to had been made — that of Hay 30, 1900 — there were conversations held. Plaintiffs charge that plaintiffs’ brother-in-law, the doctor before referred to, and her late husband, said that Mrs. Pauline Jacobs was not in a sane state of mind, and that she would have to make another will.
Plaintiffs also charge that on the 19th of the month of May the late Mrs. Jacobs was transferred to the Mercy Hospital. On the 5th of June she was carried by force, and contrary to her will, to the Washington Boulevard Plouse, and that on the 11th of June — the day after she had executed the will here attacked — she was' rushed to the Lake Side Hospital, and on the 31st of July to the Straeder House, and from there back to New Orleans.
The complaint of these plaintiffs is that all these removals in the city of Chicago had for purpose on the part of the husband and brother to keep away her relatives from her.
This brings us, in narrating the facts, to the will of the 11th of June, 1900, which will, as ■well now state, was written and signed by the testatrix in accordance with the requirements of the laws of the state of Illinois.
The will was produced, and it was probated here, after having observed the usual proceedings in admitting a foreign will to probate and in ordering its execution.
This will is attacked -on the ground that the testatrix was not sane; that the legatee, the late husband of Mrs. Jacobs, and his brother, the doctor, before named, brought fraud and other reprehensible influences to bear on the testatrix, that annuls it under the terms of the law.
In reference to the will of the 11th of June, 1900 — the last will — the uncontradicted testimony informs us that two lDhysicians (one a prominent alienist in charge of the mental and nervous disease wards • of the
Alexian Brothers’ Hospital and of the Michael Reese Institution, and a writer of special works upon insanity, and the other her attending physician in Chicago at the time) were satisfied, after having made an examination of Mrs. Jacobs’ mental condition, that she was mentally capable of making a will, and it was then the will was made. Before her will was drawn, Mrs. Jacobs stated to the witnesses to the will that she wanted all her property to go to her husband.
There were two wills drawn on the 11th of June, 1900. After the first will had been signed, it was discovered she had not signed her name to the will as it was written in the body of the will. She left out her middle or family name, “Pilger,” in signing, and it was also found that her husband’s name was in the will as executor. Mrs. Jacobs stated when the will was read to her that she wished Mr. Charles E. Buck to be her executor. The will was torn to pieces, and another was prepared in strict accord with her request, precisely as the first had been drawn, except that Mrs. Jacobs’ name was inserted in the will in the form in which she had written her name in the first will, so that when she signed her name to the second will her signature conformed to her name as it was in the body of the will, and at her special instance the name of Mr. Charles E. Buck was put in the second will as her executor. After the last will was drawn, it was read over to the testatrix carefully, word by word, and thereafter it was signed by her. She again declared that it was her will.
Mrs. Jacobs was sitting in her bed at the time, and, as the confection of the will took about two hours, from a sitting position she would lie back on the pillow. The testatrix gave very little outward evidence of suffering, and she gave every evidence of knowing all that was done in her presence. The persons present were Mr. Buck, Dr. Davis, her attending physician, Dr. Clevenger, Miss Edith Byrne, her nurse, and Mr. Mapledorem. The latter (Mr. Mapledorem, an attorney at law of repute) swore that he and Mr. Buck said to the experts before referred to that under no circumstances would there be any attempt to have a will made by Mrs. Jacobs unless they first assured Mr. Buck that she *1017 was in a condition to transact business and make a will.
This witness further says: “I wish to state right here that it was the emphatic wish of Mr. Buck and myself,” as expressed to the experts, “that they should give a fair and unbiased opinion of Mrs. Jacobs’ mental condition, no matter what it might be; that we wanted to know if she was in a mental condition to execute a will, and, if she was not, or if there was a doubt about her being able to execute a will, they would have nothing to do with its confection.”
This witness also testifies:
“Mrs. Jacobs appeared to me to be a woman who had suffered a great deal. She was emaciated. She bore evidence of being a sick woman, but at the same time she was perfectly rational, and of sound memory and mind.”
Mr. Buck, the executor, well known and highly considered by every one, testified that upon receipt of a telegram signed by Mrs. Jacobs he left for Chicago, and that upon his arrival in that city he was told that Mrs. Jacobs desired to make a will; that he called upon Mrs. Jacobs.
“She said she sent for me, and wished to see me. ‘They made me make a will at the other place, and I want to change it.’ I said, ‘That is what I believe I was sent for.’ I spoke as quietly as I could, she being ill. She recognized me perfectly, and understood what I said, and her answers were rational and clear. Returning later on the same day, the will was executed.”
Mr. Buck substantially corroborates the statement of the other attorney present, and dwells, if anything, at greater length upon the facts and circumstances attending the execution of the will.
The physician in charge of the Mercy Hospital and attending surgeon at the Alexian Brothers’ Hospital, Dr. J. D. Murphy, is not of the opinion of the other witnesses. He says she was suffering from mental delusions and fears of injury, and was non compos mentis to transact business of any kind intelligently.
He also testified that he is not an alienist or expert in mental diseases, and that he only stated facts.
Plaintiffs, in the brief, invite attention to their question, propounded under commission on cross-examination of physicians of Chicago: “If, without cause or reason, a testatrix changes her mind, would you consider that she was of sound and disposing mind, or that she had a mind or will of her own?” And they also call our attention to the answer made by one of the experts, to which we will refer further on.
The testatrix returned to her home in New Orleans, where she received medical treatment. Dr. Dyer testified that on her return from Chicago to New Orleans she “seemed perfectly sane at times, and at other times her mind seemed to wander.” Dr. Levy, her attending physician, testifies positively that she was absolutely sane.
For the sake of some brevity, other facts will be referred to in our opinion.
The judgment of the district court rejected plaintiffs’ demand. They appeal.
Opinion.
We would have to lose all confidence in human testimony were we to hold that at the date the will was made, and in the presence of the witnesses who have testified, the acts of the testatrix and her utterances were such as to indicate her testamentary incapacity.
Witnesses of the highest respectability substantially agree in the statement that she was entirely rational; that her conversation was connected, and to the point; and that her dictation of the will gave every evidence of soundness of mind and memory. Preceding the two-hours sitting in her room, held near the side of her bed, she received the attorney, Mr. Buck, with whom she was acquainted, and conversed with him intelligently.
She said to him that she expected him, and desired to make her testament. Under the authorities, as we read them, if she had been afflicted with the dementia some time prior to dictating her will, and had recovered, the will would still be valid. The evidence shows that at the time her will was drafted she had intelligence to follow her 'interest, and to refer specially to her property. A short time previous she had spoken of her relatives in terms of affection. She, as we appreciate the testimony, none the less chose her husband to be beneficiary of her bounty. Her dictation *1019 convinced those present of the integrity of her mind.
We will not dwell at length upon the jurisprudence of England and of our own country upon the' subject. They are sufficiently indicated in the following decisions, and the decisions cited in support of their texts. Kingsbury v. Whitaker et al., 32 La. Ann. 1056, 36 Am. Rep. 278; Godden v. Executors of Burke, 35 La. Ann. 161.
The jurisprudence of France and the views •of French commentators are equally as clear and determinative of the issues.
Aside from all idea of interdiction, it suffices for the validity of the testament that the testator -was sound of mind at the moment of the confection of the will.
Abstraction faite de toute idee d’interdiction, il suffit, pour la validité d’un testament, que le testateur ait été sain d’esprit au moment de la confection de cet acte. Fuzier-Herman, vol. 2, § 21, p. 429.
We quote from Laurent, volume 11, page 153. This author goes even further:
It does not suffice to prove that the testator was in a state of mental alienation, it must be shown that his insanity was without lucid intervals; that is to say, that it was permanent.
II ne suffit done pas de prouver que le testateur était dans un état habitual de démence, il faut prouver de plus que sa folie était sans intervalle lucide, c’est-á-dire qu’elle était permanente.
The question here suggests itself, was the testator at any time anterior to the date of her testament in a state of dementia, on account of which her will should be decreed null? We think not.
She was flighty at times, delirious under the influence of opiates, hysterical, nervous, but not absolutely insane. At all other times she was rational and calm. We think this sufficiently epitomizes the testimony of the witnesses, except one of the physicians, under whose medical treatment she was for about seven days, some days prior to the date of the testament. This physician (Dr. Murphy) is not an expert in treatment of diseases of the mind. Besides, he declined to answer questions propounded, for the reason that he is not an expert in dementia cases, and said that he confined himself to stating facts. They (the facts stated by him) do not relate specially to the mental condition of the testator, and, it follows, did not sustain his statement regarding her asserted insanity. The other physicians and experts who testified sustain the view that she was compos mentis during the whole time that she was in Chicago, and at all times after her return to her home in this city.
We have no reason to call in question the testimony of the physicians and experts who thought that the testatrix was sane. Their testimony is to be weighed and considered as other testimony in arriving’ at a conclusion, but not forgetting all the warnings usually urged against expert testimony.
Plaintiffs and their counsel were careful and searching in their questions. A question written by able counsel, perhaps cúrrente calamo, inquired of one of the witnesses (Dr. J. D. Murphy) if he knew the expert, naming him (an expert in whom defendants .placed great confidence, a highly prominent alienist, an author of several books upon the subject of mental diseases, to whom we have before referred):
“Tell us what his reputation is, relative to his capacity and reliability? What do you know of his having had charge of an insane asylum? What do you know of his having been confined for insanity? When and where did he become insane?”
To which witness answered that he was acquainted with this expert. His reputation was good. He knew of his having had charge of an insane asylum, but never knew of his having been confined for insanity.
It does not appear whether or not the expert ever heard of the inquiry. On the cross-examination of this expert under commission, to which we have already referred in our statement of facts, he declined to answer a cross-interrogatory, probably hastily' propounded to him. He said it contained a contradiction.
To quote from the answer:
“I am unable to answer this question. It is too involved, and appears to contain contradictions. I cannot conceive of any one doing anything without a cause or reason. The question appears to me like a trap, which would enable a misconstruction, no matter which was the question answered. It was a trap.”
Plaintiffs urge that, as indicated by the cross-interrogatory, it cannot be conceived why a person should change her mind without cause or reason. The objection on this *1021 ground meets with an answer in the following quotation from the French:
Proof of insanity of mind of the testator of nature to afford ground to pronounce de piano the nullity of the will, does not sufficiently .result from the morbid state of the testator at the moment of the confection of the testament, when it appears that neither the nature of the pain nor its effect on the mental faculties of the testator are constant, even if the disposition of the testament were to attest on his part sudden'’ changes of the mind unexpectedly, whilst the act is drafted.
“Et la preuve de l insanité ¿’esprit du testateur, de nature á faire prononcer de piano la nullité du testament, ne resulte pas suffisamment de l’état morbide du testateur au moment de la confection du testament, quand d’ailleurs ni la nature du mal, ni son influence sur les facultés mentales du testateur ne sont constantes, et alors méme que les dispositions ¿e son testament attesteraient de sa part des changements brusques de volonté survenus pendant la rédaction de l’acte.” Fuzier-Herman, vol. 2, p. 431, No. 42.
We do not think we should assume that she changed her mind without cause or reason, for there is nothing in the change, or its nature, denoting the dementia urged by plaintiffs.
The testatrix was subjected to undue influence, is the next charge of plaintiffs against the husband of the testatrix and her brother-in-law.
A wife may reasonably, in company with her husband, leave this country, and go to Mexico, in search of health. Finding no relief, she may well return, and hastily as possible go to a sanitarium in this country. If the diagnosis of her disease suggests that another change should be made, the least she can do is to follow the advice of her physician.
On the way domestic infelicity may arise, as in this case, ■while the testatrix and her husband were at Battle Creek. If it were to be said that it sometimes arises between husband and wife, not ill, in moving from place to place, while traveling, it would not alwaj’s encounter a denial. Husband and wife may find their way to Chicago, and while there seek comfort in different hotels and hospitals. The wife may be hurried, at the instance of her husband, against her wishes, from the hospital to a hotel, without being under compulsion. She may meet her relatives, make a will in part in their favor, and afterward change her mind in this regard, and execute another will, setting aside the first.
A change of intention of itself is not evidence of undue influence.
“The matter of undue influence in wills made by a husband or wife in favor of the other is beset by peculiar difficulties. It is, on the one hand, impolitic to allow inquiry into the particular relations of the parties, and, on the other, hard to follow such inquiry; but the general principle prevails. It is established, however, that there are no presumptions arising from the relations.” English & American Enc. of Law, vol. 27, p. 512.
The testimony in this case does not support the charge that the wife, owing to the treatment received, was rendered incapable of executing her will.
Judged by the laws of Louisiana, plaintiffs have not sustained their suit.
Captation and suggestion, as laid down in Zerega v. Percival, 46 La. Ann. 613, 15 South. 476, are not among the causes of nullity.
The legacy hunters of antiquity, especially in Home in her days of prosperity, encountered the satire of poets and philosophers. They sought to put an end to the ruse, to the flattery and obsequiousness of those who sought to enrich themselves thereby. It led to litigation that was almost as objectionable as the evil complained *of; to scandalous suits, it is stated. In course of time it was .made part of the Coutume de Paris (to end the number of attacks on wills), which was the law here under French domination, that proof is not to be admitted of dispositions made in hatred, anger, suggestion, or captation. This found a place in the Louisiana Code of 1808, and has since remained as part of our law's. Civ. Code, art. 1492.
The Cqde Napoleon, Basis of the Louisiana Code, says nothing of captation or suggestion. None the less, the compilers of the Louisiana Code of 1808 held on to the old law in force in France prior to the Code Napoleon, and retained the provision regarding captation.
But, after all, the will here was not null under any system of laws. If the Code of Louisiana were, like the Code Napoleon, silent upon the subject, the will would none the less be legal, as the evidence does not show that fraud and violence were resorted to in order to compel the testatrix to execute her will, nor does it show that the husband resorted to captation and suggestion to influence the testatrix.
Plaintiffs invoke the laws of the place where the will was executed. The testatrix *1023 resides here. Her property was in this state, and the will was executed to he executed in this state, and in consequence the laws of this state govern.
But conceding that the laws of Illinois should govern, plaintiffs then find scant support in the laws of that state as interpreted by her courts.
“Undue influence must be connected with the execution of the will, in order to afford ground for suit to have it decreed null.” Brownfield v. Brownfield, 43 Ill. 153.
“Undue influence must be connected with the execution of the will, and bear directly upon the testatrix at the time the will is made.” Pooler v. Cristman (Ill.) 34 N. E. 59.
We have given close and careful attention to this case, and leave it thoroughly convinced that the law and the evidence do not sustain plaintiff’s demand.
By reason of the law and the evidence being in favor of defendants, the judgment appealed from is affirmed.